[Civ. No. 28002. Second Dist., Div. One. Dec. 8, 1964.]

CAROLYN M. FRANKENHEIMER, Plaintiff and Appellant, v. JOHN M. FRANKENHEIMER et al., Defendants and Respondents.

Zagon, Aaron & Schiff, Gunther H. Schiff and Arnold H. Dubrow for Plaintiff and Appellant.

Ely, Kadison & Quinn, Stuart L. Kadison, Gang, Tyre, Rudin & Brown, Martin Gang and Milton A. Rudin for Defendants and Respondents.

LILLIE, J.—On or about September 26, 1962, while husband and wife but having theretofore separated, the Frankenheimers entered into an agreement settling their property rights; it included the familiar provision for the agreement's submission to the court in the event of a divorce proceeding. The following day Mrs. Frankenheimer was

awarded an interlocutory decree, which judgment approved the above agreement and incorporated the same by reference. By the terms of Article III of the agreement both parties represented that they had no knowledge of any community or separate assets in their possession or under their control; the same article further provided that if any other assets were thereafter discovered to have been owned by either party as of the date of the agreement, such assets "shall either be divided evenly between Husband and Wife, or each party shall be deemed to own an undivided fifty percent (50%) interest therein. . . ." Subsequently plaintiff wife received information that defendant husband and certain other defendants had assertedly acquired an interest, prior to the date of the subject agreement, in the motion picture rights to a literary property entitled "Seven Days in May." The present action, one for declaratory relief, asked for a judgment declaring that plaintiff is the owner of 50 percent undivided interest in the entire interest of the defendants in the above motion picture rights; in the alternative, for a declaration that defendants hold their interests in such rights in trust, as to a one-half undivided interest, for plaintiff's benefit. Reasonable attorneys' fees were also sought, there being a provision therefor in the event of suit to enforce the terms of the settlement agreement. Plaintiff appeals from a judgment in favor of defendant.

Except for certain subsidiary contentions, the main ground of appeal is the legal insufficiency of the evidence to support the findings and judgment—or, as specifically urged in appellant's brief, the findings of fact, conclusions of law and the judgment "rendered in this matter are contrary to the evidence and the law." We have concluded, despite appellant's insistence to the contrary, that this is not a case in which the trier of fact indulged in inferences which could not be reasonably drawn; nor is this a case in which the court below exceeded any common-sense limitation to the rules which give the trier of fact the sole prerogative to resolve conflicting evidence and inferences. After a careful examination of the record, we are satisfied that the findings are sufficiently supported.

Viewed in the light most favorable to defendants (respondents), there was evidence of the following facts:[1] In approxi-

---

[1]Future identification being dispensed with, the names of the following persons or "dramatis personae" appear in the recital of facts which follows:

*Carolyn M. Frankenheimer*, former wife of defendant John M. Frank-

mately midsummer of 1962 Frankenheimer was shown the galley proofs of "Seven Days in May" by Lewis, the latter having received them about one month earlier from Goldfarb. Frankenheimer expressed "enthusiasm" for the material. Subsequently, but prior to September 26 (the date of the property settlement agreement), Frankenheimer was given a "general and broad" proposal that he become a partner in the motion picture production of the book and put up half the cost; he replied that he "would like to." At Frankenheimer's request Lewis later talked to the former's agents, Leff and Fields, about carrying out Frankenheimer's wishes and entering into a joint venture with Lewis' company (Joel Productions). On or about July 27, Goldfarb furnished Lewis with a memorandum outlining terms for the sale of the novel's motion picture rights. Reference therein is made to the purchasing entity being "a joint venture which has yet to be established." Thereafter a "Liter-

enheimer; *John M. Frankenheimer*, former husband of plaintiff and also the sole owner or sole shareholder of defendant corporations; *Leon Kaplan* (herein referred to as "Kaplan") is an attorney at law and a partner in the firm of Kaplan, Livingston, Goodwin & Berkowitz. Said firm at all material times represented Kirk Douglas, Edward Lewis, and Joel Productions, Inc.; *Eric Weissman* (herein referred to as "Weissman") is an attorney at law and an associate of Kaplan; *Edward Lewis* (herein referred to as "Lewis") is a motion picture producer and an officer of Joel Productions, Inc.; *Peter M. Shapiro* (also identified in the exhibits and testimony as "Mr. Shapiro" and herein referred to as "Shapiro") is an officer of Joel Productions, Inc.; *Joel Productions, Inc.* (herein referred to as "Joel") is a California corporation which contracted with the publisher of the novel entitled "Seven Days in May" to acquire said rights; *Perry B. Leff* (herein referred to as "Leff") was at all material times one of the agents representing Frankenheimer; *Freddie Fields* (herein referred to as "Fields"), an associate of Leff and at all material times another of the agents representing Frankenheimer; *Rod Serling* (herein referred to as "Serling") is a writer who was employed to write the screenplay for a motion picture based on the rights; *Robert Goldfarb* (herein referred to as "Goldfarb") at all material times was an agent who represented authors, Fletcher & Knebel, and the publisher, Harper & Rowe, Ltd., of the novel entitled "Seven Days in May" in connection with the sale of the rights; *Frank G. Wells* (herein referred to as "Wells") is an attorney at law and at all times material hereto represented Frankenheimer in connection with the divorce proceedings and all of the defendants in connection with the negotiations pertaining to the rights; *Gunther H. Schiff* (herein referred to as "Schiff") is an attorney at law and one of the attorneys who represented plaintiff in connection with the settlement agreement; *CKL Enterprises, Ltd.* (herein referred to as "CKL") is a New York corporation the stock whereof is entirely owned by Frankenheimer; *John Frankenheimer Productions* (herein referred to as "Productions") is a California corporation for which no stock has been issued or was outstanding as of the time of trial of the case at bar, but which corporation is controlled by Frankenheimer.

ary Purchase Agreement" was prepared; it was not executed, however, until December of 1962 by the authors and publishers of the book, and in January of 1963 by Joel. Frankenheimer was not a signatory thereto.

The reasons that Frankenheimer never became a party to the agreement just mentioned are found in certain documentary evidence and the testimony of Attorney Kaplan. On August 6, following receipt of the Goldfarb memorandum, he wrote his associate, Weissman, with a view to drafting the necessary legal documents. Kaplan's communication states in part: "Despite the statements contained in the July 27th letter with respect to the property being purchased by a joint venture (which was originally done at the insistence of our side), I want the purchaser to be Joel Productions, Inc. alone. I do not want the Frankenheimer-Fields corporation to have any interest in this property unless and until a joint venture is signed on terms satisfactory to us between Joel and that company. That may take quite a while and the deal may disintegrate over points which will come in the negotiations and are not before the parties now." Prior to this communication, Kaplan testified, he had spoken to Lewis and pointed out that if Joel took title with Frankenheimer and subsequently did not come to terms as to the joint venture agreement, "the property would be owned by two companies . . . neither side could make any arrangements about a production or move with respect to it without the other . . . therefore we would be putting ourselves in a position of giving Mr. Frankenheimer tremendous leverage in his negotiations with us over the joint venture agreement. . . ." Lewis agreed with these suggestions and, according to Kaplan, "authorized me to give those instructions to Mr. Weissman." Later, either at the end of August or the beginning of September, Kaplan had a conversation with Goldfarb; he told the latter that he wanted to take title in the name of Joel alone, giving the same reasons previously communicated to Lewis.

On August 29 Weissman sent the original draft of the Literary Purchase Agreement to Goldfarb. While Frankenheimer was not made a party, the draft included a provision relating to an assignment to the joint venture *if* Frankenheimer entered into such an agreement. Although several changes were made in subsequent drafts, it is significant that this latter provision remained in the agreement as finally executed by Joel and the authors and publishers.

In the "latter part of September" Kaplan had a meet-

ing with Wells and Leff which (as recounted by Kaplan) points persuasively to the conclusion that Joel and Frankenheimer were still trying to work out the details of a joint venture agreement. On November 1, following more discussions with Lewis and Shapiro, Kaplan transmitted to Wells a draft of "memorandum of Basic Terms and Conditions to be contained in a joint venture agreement between Joel Productions, Inc. and CKL Enterprises, Inc. with respect to the proposed production of a motion picture to be based on the property 'Seven Days in May.'" On November 21, Wells wrote Kaplan and requested certain changes in the credit provisions of the joint venture agreement; an entirely new draft of such an agreement was enclosed. Almost one month later, on December 19, Kaplan wrote Wells after reviewing the latter's draft. Among others things, he stated that he "would like to attempt to resolve the basic points as a matter of understanding before we discuss the actual revisions and what to incorporate in our agreement and what to handle by separate letter." On January 19, 1963, Wells transmitted to Kaplan and Weissman a revised joint venture agreement. Finally, on January 31, 1963, Leff met with Lewis to resolve the remaining open points on the joint venture agreement; the next day he prepared a memorandum of such meeting which reflects substantial agreement on the several agenda thereof. Among its extensive findings, the court found that "Defendant Frankenheimer did not acquire any right, title or interest in the rights until on or about January, 1963."

The above recital, as stated at the outset, reflects the evidence most favorable to defendants (respondents), thereby adhering to the oft-repeated rule that in a case tried without a jury, the trial judge is the sole arbiter of all conflicts in evidence, conflicting interpretations thereof, and conflicting inferences which may be drawn therefrom; too, in the exercise of a sound legal discretion he may draw or may refuse to draw inferences reasonably deducible from the evidence. (*Church of Merciful Saviour* v. *Volunteers of America,* 184 Cal.App.2d 851, 856-857 [8 Cal.Rptr. 48].)

It is also the law that contradictions in the testimony of a witness do not require its total rejection. (*Cottle* v. *Gibbon,* 200 Cal.App.2d 1, 7 [19 Cal.Rptr. 82].) Appellant's briefs point to considerable testimony which might warrant the drawing of inferences different from those drawn in the instant case, as well as testimony subject to different inter-

pretations. ■ No useful purpose, however, would be served by a detailed discussion thereof since it is our duty to reject any testimony which would support a conclusion contrary to that reached by the trial court where, as here, there is substantial evidence, direct or indirect, contradicted or uncontradicted. which will support the findings. (*Primm* v. *Primm,* 46 Cal.2d 690, 693 [299 P.2d 231]; *Hamilton* v. *Pacific Elec. R. Co.,* 12 Cal.2d 598, 602 [86 P.2d 829].)

Although it is not our duty so to do (*Fomco, Inc.* v. *Joe Maggio, Inc.,* 55 Cal. 2d 162, 164 [10 Cal. Rptr. 462, 358 P.2d 918]), we shall analyze certain findings which constitute the core of this controversy. The trial court found, in addition to the finding (already mentioned) that defendant Frankenheimer acquired no interest in the novel's motion picture rights until January of 1963, that at no time on or prior to September 26, 1962, did Frankenheimer or CKL have any interest in the above rights; it was further found that as of said date Joel Productions had no interests in said property but that such rights remained with the authors or publishers until on or about December of 1962. Manifestly, in order to prevail plaintiff had the burden of showing first that Joel had an interest in the rights on September 26 and second, that as of that date Frankenheimer or his enterprises had acquired an interest either from the authors or derivatively through Joel by virtue of the asserted joint venture agreement.

That Joel had no agreement with the authors on September 26 which divested them of sole ownership is sufficiently established by the testimony of Kaplan. The latter, who stated in response to a question by the court that he "had handled over a thousand of these motion picture deals," testified that prior to December of 1962 there was, in his opinion, no legally enforceable agreement between Joel and the authors and publishers. Asked whether there was such an agreement as of September 26, 1962, the witness answered: "No, not in my opinion." In addition to the above persuasive testimony, there were numerous changes in the original draft agreement during the protracted negotiations which culminated in the instrument finally agreed upon. These changes warrant the conclusion that the parties had not orally agreed upon all of the terms and conditions which would make the subsequent preparation and signing of a written agreement a mere formality. ■ "It is, of course, . . . the law that if it is the intention of the parties that before a contract

shall exist between them, the terms of the contract are to be reduced to writing and signed by them, a complete or binding contract does not arise until a writing evidencing the terms of the agreement has been executed." (*Columbia Pictures Corp.* v. *DeToth*, 87 Cal.App.2d 620, 629 [197 P.2d 580].) The same case holds that the resolution of the above problem "is a question of fact for the trial court." (P. 629.)

 That there was no joint venture agreement between Joel and Frankenheimer on September 26, 1962, is likewise established by the testimony of Kaplan—interestingly enough, one of plaintiff's witnesses. Asked whether Frankenheimer had a vested interest in the literary property on the above date, the witness replied: "In my opinion, no." He also testified to a conversation with Wells prior to September 26: "From the first time I ever talked to Mr. Wells back in September of 1962 when I told him we were going to take title in the name of Joel and if we did not work out a deal, they had no interest in this property, he accepted that basic premise." Mention has already been made of the provision which remained in the draft of the agreement throughout the many other changes: "If Purchaser enters into a joint venture agreement with a firm or corporation controlled by John Frankenheimer for the production of the Photoplay, this agreement shall automatically be deemed assigned to such point venture." The above notwithstanding, appellant argues her side of the case and contends that evidence favorable to her contentions is more in accord with the law relative to joint ventures. She cites *Nels E. Nelson, Inc.* v. *Tarman,* 163 Cal.App.2d 714 [329 P.2d 953]; but that decision holds, as we are required to hold here, that "[w]hether there was a joint venture is a question of fact for the trial court to determine from the facts and inferences therefrom." (P. 725.)

The subsidiary contention is made that Frankenheimer and his agents made admissions against interest which establish his ownership of an interest in the subject literary property. It is said that he told Serling, the screen writer of "Seven Days in May" that he owned an interest in rights;[2]

---

[2]Frankenheimer's negotiations with Serling for the latter's employment as screen writer are also dwelt upon at length by plaintiff in support of the presumed claim that only one inference, that being favorable to plaintiff, was deducible therefrom. As stated already, however, it was for the trial court to resolve any conflicting inferences reasonably to be drawn from the evidence at bar.

that either Wells or Leff asked that Joel accept a note from Frankenheimer for the latter's contribution to the joint venture. Other asserted admissions are also pointed out. Without deciding whether these "admissions" are properly explainable, the simple fact is that it was for the trial court to accord such declarations the weight due them in the light of the whole record. ██ An admission is evidence which *tends* to prove the truth of the matter admitted (*Bonebrake* v. *McCormick*, 35 Cal.2d 16, 19 [215 P.2d 728]) which the jury or court may believe as against other evidence. (Witkin, Cal. Evidence (1954) § 221.) In no sense are admissions to be considered conclusive. (Wigmore on Evidence (3d ed.) § 1059.)

Plaintiff also makes the contention that even if the agreement for the motion picture rights was not executed until December, under the doctrine of "relation back" the ownership and rights of the defendants must be deemed to have existed as of July 27 of that year (two months before the execution of the property settlement agreement). ██ The general rule announced by the doctrine is that inchoate titles in process of completion relate back, when completed, to their inception. (*Lovell* v. *Dulac Cypress Co.*, 117 F.2d 1.) However, no California authority is cited for plaintiff's proposition that an inchoate title is acquired by preliminary negotiations to acquire motion picture rights. ██ Indeed, the occasional use in California case law of the term "relation back" occurs when some legal consequence is referred back to the date of some earlier definitive legal act.[3]

██ We finally come to the alternative relief sought by plaintiff that Frankenheimer breached his fiduciary duty, as plaintiff's husband and manager of the community property, in failing to disclose the nature of his negotiations pertaining to the motion picture rights of the subject novel, and that his interest therein or his interest in the sale thereof be deemed to be held in constructive trust for her benefit. There is no disagreement as to the law and both sides cite controlling decisions, among them *Vai* v. *Bank of America*, 56 Cal.2d 329, 337-339 [15 Cal.Rptr. 71, 364 P.2d 247]. The trial court found that on and prior to September 26 the defendants were only negotiating for the possible acquisition

---

[3]For example, "Even where the statute of limitations is involved, an amendment is permissible and it will be held to relate back to the date of filing the original complaint unless it sets forth an entirely different cause of action." (*Mountain States Creamery Co.* v. *Tagerman*, 39 Cal. 2d 355, 357 [246 P.2d 21].)

of the rights in suit and made a full and fair disclosure of their negotiations to plaintiff or her authorized representatives. The testimony is practically without conflict in support of the above finding; specifically, the testimony of the attorneys involved shows that plaintiff was kept informed of all negotiations for the purchase of the rights in question.

This disposes of all points requiring determination except the trial court's award of attorney's fees to counsel for defendants. The award was made pursuant to a provision in the property settlement agreement and plaintiff makes no argument in opposition thereto save the bare assertion that in the exercise of its discretion the court should not have made such award. The fee is a reasonable one and was properly awarded.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.