[Civ. No. 478.   Fifth Dist.   June 17, 1965.]

SIXTO CORTEZ et al., Plaintiffs and Respondents, v. ELEANOR WEYMOUTH et al., Defendants and Appellants.

Lawrence W. Young and Robert L. Young for Defendants and Appellants.

Hugh Wesley Goodwin for Plaintiffs and Respondents.

BROWN (R.M.), J.—This appeal originated in an action brought by plaintiff Cortez to have a deed declared to be a mortgage, and by plaintiffs Dayoan and Jiminez to cancel deeds conveying their interests in real property; with a cross-action brought by defendants Weymouth and Hunter to quiet title to the subject property.

The gravamen of the plaintiffs' action is fraud. Upon a non-jury trial there was a plaintiffs' judgment, and the defendants appeal therefrom.

The three plaintiffs are of Filipino origin and are unable to read or write in the English language.

Defendant Weymouth originally sold the real estate which is the subject of this controversy to Cortez and Jiminez in 1947 for approximately $3,510. Cortez testified that the value of the property at the time of the transaction herein set forth was approximately $15,000, while Hunter and Weymouth testified that its value was $8,000 to $9,000.

At some unspecified time Jiminez conveyed some interest in the property to Dayoan by an unrecorded instrument.

In 1959 one Lucille Kendrick obtained a judgment in the sum of $1,940.35 against Cortez and another person. An abstract was recorded in Fresno County. The judgment was against the interest of Cortez in the realty. Pursuant to a writ of execution Cortez' interest in the property was sold at a sheriff's sale on February 20, 1962, to Kendrick. In September 1962 Jiminez went to the home of Weymouth and told her there was a judgment against the property and he was going to lose it, and asked her help.

The trial judge could not understand any of the plaintiffs,

and called in an interpreter. The trial record clearly shows that the plaintiffs had difficulty in understanding and speaking the English language. On the other hand, Weymouth had been engaged in the business of lending money secured by real property since 1943, and Hunter had been a real estate broker since 1950.

Weymouth testified that she went to the sheriff's office, to a title company, and to a credit bureau, and was told that the judgment was against the property and that she believed that the lien ran to the whole property and not just to the interest of Cortez therein. As to her conversation with Jiminez, she testified:

"Well, Mr. Jiminez wanted to know what I had found out and if there was any way that I could help him, and I told him that I had found out that there was this judgment against the property and that if he would be willing to deed the property to me that I would let him live there as long as he lived, and he said well, he would be happy to do that because he was an old man, he didn't have any relatives, and all he needed was a place to live the rest of his days."

Having no title to this property as yet, nevertheless Mrs. Weymouth and Jiminez went to a title company on September 20, 1962, where Jiminez signed a grant deed conveying his interest in the property to Weymouth, though no deed conveying a life estate to him was made at that time. A few days later Jiminez and Dayoan called on Mrs. Weymouth and Dayoan said that since Jiminez was going to lose his property he, Dayoan, would deed his own interest to her if she would let Jiminez have a home there. She told him they would go to the title company and have a deed made, but she did not tell Dayoan that she had already arranged with Jiminez to exchange a life estate in a portion of the property to Jiminez or that he had already deeded his interest to her. Dayoan then met Weymouth at the offices of a title company and signed a deed in favor of Weymouth.

Jiminez' testimony is almost unintelligible. He did testify that he went to Weymouth's home to see if she could help him with a welfare problem and that he asked her to "hold" his property for him, that he signed the deed but did not read it, that he could not read, and that his age was "75 or something."

Dayoan testified that Weymouth telephoned him, asked him to go to the title company and said "I am going to give you

deed.'' He went to the title company and met her there. She said, ''I am going to give you your deed. So I want you to sign the paper.'' So he signed the paper but did not read it. He did not receive any money from Weymouth. On cross-examination he testified that he just signed the deed because he did not know how to read; that he did not understand what it meant; and he thought that Mrs. Weymouth gave him a deed and he had to sign some paper; that Mrs. Weymouth and the escrow lady both told him to sign it. He testified that they let him sign the paper and then Weymouth gave him his title. He testified, ''And there and then she give me title after that. 'All right. Here's yours.' 'Thank you,' and then, I guess, well, then, that's all what I know. . . .''

On October 17, 1962, Kendrick assigned her interest in the judgment against Cortez to the defendant Hunter, and Kendrick conveyed the interest purchased at the sheriff's sale to Hunter and Weymouth. On October 30th Mrs. Weymouth purchased the interest of Kendrick in the judgment and the property for $2,211.56 in cash, though Hunter invested no funds.

The sheriff's sale having taken place on February 20, 1962, the one-year period of redemption would not expire until February 20, 1963. In December 1962 Mrs. Weymouth went to see Cortez and told him about the judgment, that Jiminez and Cortez were going to lose their place, that the judgment was against the place and that Cortez would lose it unless he paid the judgment. Mrs. Weymouth testified that when she told Cortez about the judgment and that he was going to lose his property unless he paid it, he would not talk to her; that ''He said that he wasn't worried or words to that effect; that he had somebody up in San Jose that was going to take care of it or redeem it actually, only he didn't use that phrase.'' But Cortez did tell Mrs. Weymouth to go to the office of his attorney, Mr. Goodwin, which she did.

Mr. Goodwin testified that Weymouth, Hunter and Cortez met in his office in December 1962, that Mr. Goodwin told Weymouth and Hunter that the redemption period would expire sometime in February 1963, that Mrs. Weymouth had promised to help Cortez. During a later telephone conversation with Mrs. Weymouth, Mr. Goodwin told her to either let them know she was going to advance the money, or not, because the time was running out and that there were other sources available to assist Mr. Cortez.

On expiration of the redemption period the sheriff deeded

Cortez' interest in the property to Kendrick, who in turn conveyed her interest to Weymouth and Hunter. Weymouth and Hunter, on March 29, 1963, conveyed a life estate to Jiminez for a small portion of the real property involved.

The trial court found that the plaintiffs were the owners of the real property, were of Filipino nationality, unable to read or write the English language and able to understand very little of it, that the entire transaction was carried out in the English language, that Jiminez and Dayoan made the deeds herein mentioned, that the defendants obtained the interest of Cortez by virtue of assignment and the sheriff's deed. The court further found:

### "VI.

"That defendants, and each of them, acquired the interests of each plaintiff aforesaid in said property by false and fraudulent representations made by defendants, acting together, to each plaintiff. That each and all of the said representations were false and fraudulent, as defendants well knew, and that when made by defendants, said representations were made for the purpose of defrauding plaintiffs, and each of them, out of his said property.

### "VII.

"That plaintiffs, and each of them, did rely on said representations, which were material, and as a result jeopardized their interests in said property.

### "VIII.

"The Court finds that no consideration whatever was given for the deeds executed by plaintiffs Blas Jiminez and Guillermo Pete Dayoan herein, but that defendant Eleanor Weymouth did expend the sum of $2211.56 on behalf of plaintiff Sixto Cortez and that said defendant should have a mortgage as security for repayment of said sum with interest commencing July 3, 1964, at 7% per annum.

### "IX.

"That the defendants claim and assert absolute ownership in said property by way of defense and cross-complaint and their allegations in this respect are hereby denied and found to be untrue."

From the findings the court concluded that the deeds executed by Jiminez and Dayoan were null and void and should be cancelled; that Cortez was indebted to Weymouth in the

sum of $2,211.56; that the document evidencing title in defendants was declared to be a mortgage, securing the repayment of the indebtedness of Cortez. Judgment was entered accordingly, with this appeal following.

### The Sixto Cortez Case

Defendants maintain that there was no showing of any confidential relationship between Cortez and the defendants; that the court did not find such confidential relationship. These statements are true and there is therefore no issue with respect to this point on appeal.

Defendants question the sufficiency of the evidence to support the findings, but we think that the evidence is ample to support such, and will not belabor the well settled law that this court is bound thereby. (*Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367 [210 P.2d 757]; *Berniker* v. *Berniker,* 30 Cal.2d 439 [182 P.2d 557].)

We believe there was sufficient evidence to support the judgment. The defendants related that Weymouth never agreed to refinance Cortez, but they overlook the contradictory evidence. Attorney Goodwin testified positively that Mrs. Weymouth said she would help Cortez and the only problem was the method of repayment; that neither Hunter nor Weymouth told Cortez that Weymouth had already purchased the Kendrick judgment; that in his office Weymouth stated affirmatively that she would help Cortez in connection with paying off the judgment. Here, the trial judge chose to believe Mr. Goodwin and disbelieve Mrs. Weymouth and Mr. Hunter.

In the pretrial order it was agreed that all of the dealings of Weymouth and Hunter in obtaining the interest of Cortez were had with Kendrick, the judgment creditor; that, even assuming that Weymouth and Hunter had a mortgage on the interest of Cortez in the property, the latter cannot seek to recover title to this property by cancelling the sheriff's deed or the other deeds without tendering to Weymouth the amount of money which she had paid Kendrick; and that therefore, when this suit was commenced after the sheriff's sale Cortez had no right, title or interest in the property and should not recover, and even assuming that Cortez had an equitable interest in the property, he cannot maintain a quiet title action against the owner of the legal title. (*South* v. *Wishard,* 123 Cal.App.2d 642, 653 [267 P.2d 827].) The cause of action in behalf of Cortez, although not a model pleading, contains allegations that Weymouth represented she would

advance funds in order to permit Cortez to redeem his interest in the property, that he relied thereon, that she failed to keep the promise, that by reason of the fraudulent representations and his reliance thereon he failed to pursue other sources from which the money had been assured, that the representations were part of a scheme of defendants to secure the property from all of the plaintiffs, the defendants working on the plaintiffs one by one. Thus, the gravamen of the complaint and the relief sought is to have the defendants' deeds declared to be a mortgage, and the quiet title aspect is incidental to the main relief sought. (See *Leeper* v. *Beltrami*, 53 Cal.2d 195, 215-216 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803].)

### *The Dayoan and Jiminez Case*

Defendants here claim that the Jiminez and Dayoan transaction was a voluntary one, that no consideration is necessary, that in effect what was being done was to take over the interest of Jiminez and Dayoan in the property in return for assuring Mr. Jiminez of a life estate to a small portion of the property; that when the sheriff gave a good deed as far as Cortez' interest is concerned Mr. Jiminez and Dayoan would face a suit in partition which would mean that they might lose their property in such an action and thus Mr. Jiminez was avoiding any problems by taking back a life estate to a mere portion of the four and one-half acres. However, it will be noted that according to defendants' own testimony the transaction had been agreed upon with Jiminez and Jiminez had executed a deed five days prior to the conversation with Dayoan and before Mrs. Weymouth had obtained the assignment of the judgment from Kendrick. Defendants claim that Weymouth was not guilty of any fraudulent representation to the effect that the Kendrick judgment was against the property, that she believed the judgment was against the property and she therefore had no knowledge that such was untrue and that the judgment was only against Cortez personally.

The trial court obviously did not believe Mrs. Weymouth for it made the following statement during the trial: ''Well, that's certainly going to be a chronic factor. I just can't conceive, honestly in my own mind, of anybody in a title company saying there is a judgment against property. It's impossible to get a judgment against property, and there is no title company in the world that would ever tell you that this judgment is against property. It's against the individual.''

The trial court also stated: "I don't want to hear anymore. This case is absolutely incredible to me on behalf of your clients, Mr. Young. It's inconceivable to me that Mrs. Weymouth, who has been loaning money on real estate since 1943, and Mr. Hunter, who has been in the real estate business since 1950 and some odd, will go down to a title company and accept a statement from them that this piece of property, this judgment is against the entire piece of property, when there's only judgment as against one party. Mr. Cortez had this judgment rendered against him. There was nothing whatsoever against Jiminez or against Dayoan. Now it's absolutely ridiculous to sit up here and hear statements here, 'We were giving Jiminez back a deed with a life estate. In other words, we have taken his property, but we have given him a life estate.'"

Obviously, from this statement, the court disbelieved Mrs. Weymouth. There is in the record some indication that Weymouth knew that the judgment was against the interest of Cortez alone. She sought independent deeds from Dayoan and Jiminez, but none from Cortez. She took a deed from Jiminez on September 20, 1962, but did not reconvey a portion of the property to him for his life until March 29, 1963, after the period of redemption had passed and the sheriff had executed his deed to Kendrick who had, in turn, conveyed to Weymouth and Hunter. Had she believed that the judgment covered the whole of the property, it is logical that she also believed the sheriff's deed would have conveyed the whole thereof, and she would not have required deeds from Jiminez and Dayoan.

In *Norgard* v. *Estate of Norgard,* 54 Cal.App.2d 82* [128 P.2d 566], it was stated at page 89: "The trial court is the sole judge of the weight and effect of testimony and of the credibility of witnesses, and is free to disbelieve them, even though they are uncontradicted, if there is any rational ground for doing so."

Defendants quote from *Gridley* v. *Tilson,* 202 Cal. 748, 752 [262 P. 322], as follows: "Defendant, however, attempts to escape the effect of the settled rule of these cases by testifying that he did not have his glasses with him at the time he signed the subscription contract and gave the notes and therefore he did not read the contract nor the provision referred to.

---

*Overruled on another point in *Bernkrant* v. *Fowler,* 55 Cal.2d 588 [12 Cal.Rptr. 266, 360 P.2d 906].

But this cannot afford him an excuse in the absence of a showing that he was prevented by the agent from reading the limiting clause or was otherwise tricked into signing the document without reading it. He made no request to have the contract read to him.''

■ We think there was a showing here that Jiminez and Dayoan were unable to read and comprehend the deeds; and that Jiminez relied on the statements of Mrs. Weymouth that she was keeping his property from being taken away from him and that she was going to give him a life estate to a portion thereof. These representations to Jiminez and Dayoan that Jiminez would lose his property on account of the Kendrick judgment were untrue, but Jiminez believed them to be true, as did Dayoan, and these representations were certainly material.

■ One material misrepresentation is sufficient; there need not be a multitude of representations. (*Hefferan* v. *Freebairn*, 34 Cal.2d 715 [214 P.2d 386.)

In volume 23, California Jurisprudence 2d, Fraud and Deceit, section 8, pages 21-23, it is stated: ''But where a party executes a contract while he is weak in mind because of illness or other reason, and there is a plain inadequacy of consideration, imposition or undue influence will be inferred and the contract will be set aside; and the weakness in such a case need not amount to absolute disqualification. . . . This ignorance or incompetence must be such, however, as rendered the party incapable of understanding fully the nature of the transaction.''

In section 9, volume 23, California Jurisprudence 2d, page 23, it is said: ''Courts of equity often relieve a party from the effect of a transaction which has been procured by taking unconscionable advantage of his condition or necessities.''

■ The general rule is set forth in that same volume, section 18, pages 47-48, as follows: ''The general rule that deception as to matters of law does not amount to fraud has its exceptions. . . . A similar rule obtains where a misrepresentation as to the law is made to obtain an advantage over a person while he is in a condition of great physical and mental weakness, or where he necessarily relies on the statements of the party making the representation.''

In the present case Mrs. Weymouth made certain representations that the judgment was against the property of Jiminez and Dayoan. In fact, the court found that she knew exactly that judgments are not against property, but are against individuals.

■ It is elementary that to make out a case of misrepresentation, the plaintiff must show not only a representation of a material fact upon which he was entitled to rely, but that he did in fact rely to his damage. (*Edwards* v. *Lang,* 198 Cal.App.2d 5 [18 Cal.Rptr. 60]; *Eck* v. *McMichael,* 176 Cal.App.2d 368 [1 Cal.Rptr. 369].) ■ Whether or not fraud exists, including the element of reliance, is ordinarily a question of fact for the fact-finding entity. ■ As the court said in *Vogelsang* v. *Wolpert,* 227 Cal.App.2d 102, 110 [38 Cal.Rptr. 440]: ''Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims, the function of the trial court in fraud cases is particularly significant. It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision. [Citations.]

''As a determination of the existence of fraud is particularly within the decisional field of the trial judge, the appellants are attempting to swim upstream against a strong current of authority when they maintain that there was no such showing in the long record, and in effect that this court should pass again upon the factors which the trial court found to be indicative of fraud.''

■ And at page 111: ''As is observed in *Feckenscher* v. *Gamble, supra,* 12 Cal.2d 482, 496-497 [85 P.2d 885]: ' ''That plaintiff is too credulous is not generally a defense: 'The test of the representation is its actual effect on the particular mind, whether it is a strong or circumspect mind, or one weak and too relying.' '' (*Neff* v. *Engler,* 205 Cal. 484, 489 [271 P. 744].)' ''

In the case of *Blackman* v. *Howes,* 82 Cal.App.2d 275, the court in considering the issue of justifiable reliance, said at pages 278-279 [185 P.2d 1019, 174 A.L.R. 1004]: ''When the facts are susceptible to opposing inferences, whether a party relied upon a false representation, notwithstanding prior information which, if investigated, might have led to discovery of the falsity of the representation, is itself a question of fact to be determined by the trier of fact. [Citation.] Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means

of knowledge were open to him. In such a case, no duty in law is devolved upon him to employ such means of knowledge.''

In *Bank of America* v. *Greenbach*, 98 Cal.App.2d 220, at page 234 [219 P.2d 814], the court said: ''It is also well settled that when a fact is peculiarly within the knowledge of the person making the representation and not within the knowledge of the person to whom it is made, the latter has the right to rely upon the representations of the former respecting such fact.''

Cortez, Jiminez and Dayoan were all ignorant and inexperienced with regard to matters concerning the material representations made by Mrs. Weymouth, and such ignorance was known to her and she also was aware that reliance was made upon her representations, and particularly where such facts could be expected to be within the knowledge of the defendants.

In *Seeger* v. *Odell*, 18 Cal.2d 409 at pages 414-415 [115 P.2d 977, 136 A.L.R. 1291], it was said: ''It is well established in California and other jurisdictions that a person who has been induced by fraudulent misrepresentations to enter into a contract or to make a conveyance may have the contract or conveyance set aside and secure a restitution of those benefits lost to him by the transaction. [Citations.] A fraudulent misrepresentation is one made with the knowledge that it is or may be untrue, and with the intention that the person to whom it is made act in reliance thereon. [Citations.] It must appear, however, not only that the plaintiff acted in reliance on the misrepresentation but that he was justified in his reliance. . . . He may not justifiably rely upon mere statements of opinion, including legal conclusions drawn from a true state of facts . . ., unless the person expressing the opinion purports to have expert knowledge concerning the matter or occupies a position of confidence and trust. . . . If, however, the opinion or legal conclusion misrepresents the facts upon which it is based or implies the existence of facts which are nonexistent, it constitutes an actionable misrepresentation. . . . Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent. . . . As a general rule negligence of the plaintiff is no defense to an intentional tort. . . . The fact that an investigation would have revealed the falsity of the misrepresentation

will not alone bar his recovery . . ., and it is well established that he is not held to constructive notice of a public record which would reveal the true facts. . . . The purpose of the recording acts is to afford protection not to those who make fraudulent misrepresentations but to *bona fide* purchasers for value. Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man. Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. . . . 'No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' (*Chamberlin* v. *Fuller*, 59 Vt. 247 [9 A. 832, 835].) If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery. . . . 'He may not put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth. . . . ' (Prosser, Torts, 749.)"

In *Holibaugh* v. *Stokes*, 192 Cal.App.2d 564 [13 Cal.Rptr. 528], the court, sitting in equity, gave Mr. Holibaugh a lien on certain property held of record in the name of appellant Clayton, even though Clayton had no relationship or acquaintance whatsoever with Holibaugh. Here Holibaugh had loaned money to another (Stokes) to purchase real property which was done, but she in turn deeded the property to appellant Clayton without any knowledge of Holibaugh. It was held that the court had jurisdiction over all the parties and the subject matter and had authority to make a complete disposition of all issues and facets of the case, that a complete determination was necessary to settle the interests of the parties and to clarify the title to the real property and prevent subsequent litigation, and that it was absolutely essential to achieve an equitable and just result between the parties.

Thus, to make a complete disposition of this matter pending before us, we believe the trial court was correct in ordering that Cortez was indebted to Weymouth upon a mortgage debt which was against his interest in the property, and that the deeds from Dayoan and Jiminez to Weymouth should be cancelled.

■ Although not placed in issue upon this appeal, there is an obvious inadvertent error of omission in the judgment which, unless corrected, may result in future litigation on the

part of defendant Hunter. The trial court found that the plaintiffs were the owners of the real property here involved and that defendants Weymouth and Hunter were not entitled to recover on their cross-complaint. Those provisions were not carried over into the judgment. The judgment should make a formal declaration to that effect but we do not deem it necessary to reverse for that purpose. The judgment is hereby modified by adding that the defendants, and each of them, take nothing by virtue of their cross-complaint to quiet title in themselves to the subject real property.

As so modified, the judgment is affirmed. Respondents shall recover costs on appeal.

Conley, P. J., and Stone, J., concurred.