[Civ. No. 35231. Second Dist., Div. One. May 21, 1970.]

ROBERT A. DAVIS, Plaintiff and Respondent, v.
LOUIS H. KAHN et al., Defendants and Appellants.

**COUNSEL**

James Schwartz for Defendants and Appellants.

Paul K. Duffy for Plaintiff and Respondent.

## OPINION

**LILLIE, Acting P. J.**—This litigation had its genesis in two joint ventures involving the sale of desert properties in San Bernardino County. In each instance plaintiff, who had found owners willing to sell to him, thereafter encountered difficulties in meeting the purchase price; he then contacted defendants, husband and wife (the latter being joined as the formers' principal). In consideration of defendants' financial assistance, it was orally agreed that plaintiff would nominate them as vestees under his written agreements of purchase with the owners and that, after purchase of the properties in the names of defendants, there would be an equal division of the net proceeds upon resale by defendants of any portions of such properties; as to the unsold portions, the parties would each retain a one-half interest therein. When defendants refused to divide the proceeds of the resales, this action was instituted. The complaint, sounding in fraud, alleged false representations by defendants and sought damages, both compensatory and punitive. After a court trial, judgment was rendered for plaintiff on each of the two causes of action alleged; in addition to actual damages against both defendants, punitive damages were assessed against defendant husband by reason of his malicious and fraudulent conduct. Defendants appeal from the judgment.

The first cause of action related to the "Needles" property. It alleged plaintiff's written agreement on or about July 1, 1957, with one Barbara Spork to purchase four sections of land for $46,000 to be paid by plaintiff or his nominee over a period of several years, the delinquent taxes in the sum of $26,478.88 also to be paid by him within a five-year period; that two weeks later upon defendants' representations they would carry out their end of the bargain, the joint venture with defendants was entered into whereunder plaintiff would receive 50 percent of all net resale proceeds and retain a 50 percent interest in all properties unsold; that at the time of making such representations defendants knew them to be false and made such misrepresentations for the purpose of inducing plaintiff to change his position regarding the purchase of the various sections; that plaintiff having secured new persons to repurchase them, all the properties were thereafter sold, save and except certain acreage in Section 9 having a value of $10,000; that he did not discover defendants' fraud until "within three years last past," and was damaged in the amount of $27,724.50 (one-half of the profits remaining after satisfaction of the original purchase price) and $5,000 (plaintiff's one-half interest in the acreage unsold); and that defendants acted maliciously, for which punitive damages should be assessed.

The second cause of action related to the "Brodine" property. The trans-

action entered into around October 15, 1957, followed the same pattern as that alleged in the first cause of action. The property was originally owned by one Daniels and resold by plaintiff to Joseph Brodine for a profit, the net proceeds wrongfully retained by defendants amounting to $13,000. Plaintiff's damages accordingly amounted to one-half thereof, $6,500 plus interest. In addition, plaintiff again alleged that defendants acted maliciously, and sought an assessment of punitive damages; he also alleged that defendants' fraud was not discovered until within three years last past.

Defendants' answer contained material denials of the pertinent claims set forth in the complaint; by way of additional defense, it affirmatively pleaded certain releases executed in 1958, and raised the bar of the statute of limitations (Code Civ. Proc., § 338, subd. 4) and laches on plaintiff's part.

Rejecting the foregoing denials and affirmative defenses, the trial court found, as to the first cause of action, that plaintiff's lost profits from the resale amounted to $23,289.66 and his damage from the loss of one-half of the unsold acreage was $5,000. As to the second cause of action, it found that plaintiff's lost profits in the "Brodine" transaction amounted to $7,465. In addition to the foregoing compensatory damages the court assessed punitive damages against defendant Louis H. Kahn in the sum of $5,000.

Appellants contend that (1) the findings and judgment lack substantial evidentiary support; (2) the affirmative defenses pleaded in the answer effectively bar recovery; (3) there was no fraud on their part; (4) the trial court erroneously failed to make complete findings and erroneously failed to make the special findings requested by them and (5) a fair trial was not accorded them because the court prejudged the case and demonstrated in other respects a prejudice toward them.

At the outset, an examination of the reporter's transcript justifies the observation that neither plaintiff nor defendant Louis Kahn was a paragon of business integrity. Indeed appellants' brief asserts that "the testimony of both parties is replete with confusion, inconsistencies, and discrepancies," being partially the result of the passage of some 11 years from the formation of the joint ventures and the date of the trial. For example, although defendant Louis Kahn first testified that there was no joint venture in 1957, he subsequently admitted filing a joint venture tax return for that year; later there was an effort to rehabilitate him by evidence that he did so because of erroneous legal conclusions. As for plaintiff, he admittedly failed to file any federal income tax return for the years 1956 through 1964, giving the rather implausible explanation that he had "arranged" with the Internal Revenue Service not to file. There are other matters which, along

with those just stated, might have induced a trial judge to leave the parties where they were found, but certain fundamental and oft-repeated rules govern at this stage of the proceedings.

Thus, in a case tried without a jury, the trial judge is the sole arbiter of all conflicts in the evidence, conflicting interpretations and conflicting inferences which reasonably may be drawn therefrom; is the sole judge of the credibility of the witnesses and may disbelieve them even though they are uncontradicted if there is any rational ground for doing so; and, in the exercise of a sound legal discretion, may or may not refuse to draw inferences reasonably deducible from the evidence. (*Blank* v. *Coffin*, 20 Cal.2d 457, 461 [126 P.2d 868]; *Church of Merciful Saviour* v. *Volunteers of America*, 184 Cal.App.2d 851, 856-857 [8 Cal.Rptr. 48].) When the sufficiency of the evidence to sustain a finding of fact is contested on appeal, the issue thus presented is whether there is any substantial evidence, direct or indirect, contradicted or uncontradicted, which will support the finding (*Primm* v. *Primm*, 46 Cal.2d 690, 693 [299 P.2d 231]; *Richter* v. *Walker*, 36 Cal.2d 634, 640 [226 P.2d 593]); it will be assumed that the trial judge resolved every factual conflict in favor of the prevailing party (*Thomas* v. *Hunt Mfg. Corp.*, 42 Cal.2d 734, 736 [269 P.2d 12]; *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]); and every inference reasonably deducible from the evidence which will support the finding must be accepted. (*Hamilton* v. *Pacific Elec. Ry. Co.*, 12 Cal.2d 598, 602 [86 P.2d 829]; *Wilbur* v. *Wilbur*, 197 Cal. 1, 7 [239 P. 332]; *Garland* v. *Hirsh*, 74 Cal.App.2d 629, 633 [169 P.2d 405].) Finally, it is settled that contradictions in the testimony of a witness do not require its total rejection. (*Frankenheimer* v. *Frankenheimer*, 231 Cal.App.2d 101, 107 [41 Cal.Rptr. 636].)

With respect to appellants' first contention, they argue that the evidence is so lacking in substantiality that it supports neither the thrust of plaintiff's case nor the parry of their denials and affirmative defenses. While admitting that the parties' versions of their oral agreements were in conflict, thus presenting factual questions already resolved, defendants nevertheless argue that plaintiff's own version of what occurred contains internal discrepancies and contradictions which warranted its total rejection. There again, defendants are confronted with the principle that it is for the trial court to weigh such contradictions and determine whether the testimony, viewed in its entirety, is obviously false or inherently improbable; if the challenged testimony belongs in either category, it constitutes no evidence at all and is properly subject to review on appeal. (*Bennett* v. *Chandler*, 52 Cal.App.2d 255, 261 [126 P.2d 173].) The testimony referred to by defendants is neither obviously false nor inherently improbable; as was his province, the trial judge presumably considered certain manifest contradictions in the

manner he deemed proper and accepted that part thereof which he concluded represented the truth.

That part, accepted as true, and other facts supporting plaintiff's version of the transactions are in substance as follows: As to the first cause of action, when plaintiff discovered that the seller (Spork) would not extend the closing date of the escrow, and after he had unsuccessfully attempted to reach a San Francisco dentist, named Campbell, who had participated in similar deals with him in the past, plaintiff contacted defendant Louis Kahn with whom plaintiff had also had previous dealings. Plaintiff testified that at that meeting Kahn told him he "would go along with me and he would put up the money and collect all funds and take care of the taxes and take care of all the payments, and when all the obligations were taken care of and he had gotten his money back that we would split 50-50"; that he (plaintiff) replied, " 'That's fine.' So I went ahead and I transferred the escrow over to Kahn's name." When this was done, Kahn admittedly issued a check for $1,000 to plaintiff in repayment of the latter's original down payment on the Spork property. Additional testimony by plaintiff concerning the parties' commitments in the joint venture adhered to the allegations contained in the complaint. Also, defendant Louis Kahn filed a joint venture "partnership" return for the year 1957, admitting that his accountant "was led to believe that there was a partnership arrangement." The same defendant further admitted that in September of 1957 he paid plaintiff one-half of the money received for a right of way through the "Needles" property, also admitting that at that time he entertained no reservations about plaintiff's one-half interest in Section 9 (part of the "Needles" property). There was testimony by Dr. Campbell that he and plaintiff previously had participated in similar transactions, orally entered into, with plaintiff in the past; and there was other evidence which dispelled the possible notion that plaintiff's recital of the critical events was unworthy of belief. Apparently there is no dispute that the resale resulted in a net profit which, with interest at 6 percent, amounted to $46,579.33, one-half of which was plaintiff's under the agreement pleaded. Similarly unchallenged is the determination that plaintiff's share of Section 9 was worth $5,000.

As to the second cause of action, plaintiff testified that he went to San Diego in September of 1957, following a conversation with Kahn about the purchase of 1,000 acres "like we did in Needles." The owner-seller was one Daniels; after two days of negotiation an escrow was subsequently opened. The purchase price was $7,000, $2,000 down and the balance at 6 percent payable in 10 years. By a check drawn on Davis Desert Properties, Inc., a wholly owned corporation, in the sum of $5,000, plaintiff made an initial deposit on the purchase of the property, a receipt therefor from the escrow

holder reading "For account of Kahn & Wysocki."[1] Upon plaintiff's return, Kahn expressed irritation that Wysocki's name was on the receipt, and said he wanted it all in his name and he and plaintiff would work the deal "50-50" after all expenses were paid and the "Needles" deal was all paid off. Kahn also stated that he wanted plaintiff to deed back the latter's one-half of Section 9 as collateral for financing the Daniels purchase; this was done. The Daniels purchase was finally consummated with the help of Kahn's money. Thereafter plaintiff consummated the resale of the property on January 23, 1959, to one Brodine as evidenced by a deposit receipt for $1,000 listing the seller under this signature, "Louis H. Kahn by Robert A. Davis." As indicated therein, the purchase price was $20,000, $3,000 additional down, assumption of Kahn's 10-year note to Daniels ($4,704.78) which was secured by a second trust deed to Kahn in the sum of $11,295.22 at 6 percent interest. The evidence reveals that Brodine did not pay off the second trust deed until June of 1965.

The fact that Brodine's note was not paid off until the expiration of almost eight years after formation of the joint ventures will serve to explain why the trial court rejected the affirmative defense that this suit was not timely filed. While the action was not instituted until August of 1966, plaintiff testified that either in 1962 or 1963 he called Kahn and asked how things were progressing, to which defendant replied that he still had not gotten all of his money, that some people were pretty slow and that he would let plaintiff know;[2] that he talked to Kahn again in 1964 and was told that everything was still about the same; that in 1965 he first discovered that Kahn had apparently recouped all of his capital investment in the various enterprises with the sale of a portion of Section 9 to the State of California; that he then telephoned Kahn and told him that "we should settle up now because he would have definitely have had all his money back," to which Kahn replied, " 'Drop dead. You're not going to ever get anything,' and that you'd better get yourself a good attorney . . .'"; that he waited until 1963 or 1964 to make inquiries because he knew it would be quite a number of years before Kahn would get his money back—the "Brodine" deal had two more years of payments, and the taxes (which Kahn was carrying) on Section 9, amounting to $4,000 or $5,000, were delinquent. Additionally, plaintiff testified that he trusted Kahn, who was some 25 years his senior and "seemed like a father to me"; that defendant had "lots of money"

---

[1] The second party (Wysocki) was a then female acquaintance of plaintiff.

[2] "THE COURT: You mean that if he had a $1,000 into, say, one of the five deals, and he got a thousand dollars back but there was still a balance due on the other deals, you still weren't entitled to anything? THE WITNESS: That's right. That's the way he made it." In other words, as stated in plaintiff's brief, the "Needles" and "Brodine" deals were interlocking.

and he (plaintiff) did not have to worry "about them taking anything because they got all they want anyway."

Regarding the purported releases, dated January 2, 1958, and April 1, 1958, respectively, and relating to the "Needles" deal,[3] plaintiff testified that the recitals contained therein were not present on two blank sheets of paper when he affixed his signature thereto; that he had in the past signed many papers in blank, including three pieces of paper in 1960 for defendant Louis Kahn, but that he "would never have signed anything like that in ten million years."

While the above discussion relates to appellants' first point that the determinations challenged lack evidentiary support in their entirety, by its very nature it has also dealt with appellants' next two points that (2) the affirmative defenses barred recovery and (3) there was no showing of actionable fraud. We are of the opinion that the trial court, on the basis of the foregoing summary of evidence, could properly infer that defendants at the time of entering into the two joint ventures, had in fact no intention of performing the promises in question but, on the contrary, had for their purpose and objective the eventual retention of all the sums bargained for.

■ A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. (*Nelson* v. *Abraham,* 29 Cal.2d 745, 749 [177 P.2d 931].) ■ Upon the formation thereof, the co-adventurers assume the status of fiduciaries and neither group has the right to acquire the property to the exclusion of the other. (*Lasry* v. *Lederman,* 147 Cal.App.2d 480, 487 [305 P.2d 663].) ■ Further, "[i]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. [Citation.]" (*Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 771 [128 P.2d 665].) Defendants' acts necessarily viewed in the light most favorable to plaintiff-respondent, clearly violated this implied covenant. ■ Also, during the existence of the fiduciary relationship any transaction by which one of the co-adventurers secures an advantage over the other is presumptively fraudulent and casts a burden on such party gaining the advantage to show fairness and good faith in all respects. (*Solon* v. *Lichtenstein,* 39 Cal.2d 75, 82 [244 P.2d 907].)

---

[3]By the terms of the former, "for the sum of $1.00 and other valuable consideration," plaintiff purportedly released and relinquished to defendants all his right and interest to the parcels of land therein described; by the latter, he made the same relinquishment to the same parties except that the additional consideration therefor was "for waiver of all commissions due or to become due up to the date of this release."

Such presumption is evidence and is sufficient to sustain a finding of fraud even though there may be direct evidence contrary to it. (*Bradner v. Vasquez,* 43 Cal.2d 147, 153 [272 P.2d 11].) Needless to say, the above principles are applicable here.

But, say appellants, even assuming that their intentions were misrepresented, it was necessary for plaintiff to show that he relied on their oral promises and engagements. (*Cortez* v. *Weymouth,* 235 Cal.App.2d 140, 150 [45 Cal.Rptr. 63].) However, as *Cortez* holds, "Whether or not fraud exists, including the element of reliance, is ordinarily a question of fact for the fact-finding entity." (P. 150.) Too, in view of the fiduciary relationship here, there can be no doubt that plaintiff had the right to rely on the representations made to him without the duty of further inquiry. (See *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 440 [159 P.2d 958].)

*Hobart* also governs defendants' claim that the action was barred by the three-year statute of limitations. (Code Civ. Proc., § 338, subd. 4.) "In the absence of a duty to make inquiry, as pointed out above, the statute does not run merely because the means of discovery were available, and plaintiff is not compelled to disprove that such means existed. He need only establish facts sufficient to show that he made an actual discovery of hitherto unknown information within three years before the filing of the action." (*Supra,* at p. 442.) To the same effect is *Bennett* v. *Hibernia Bank,* 47 Cal.2d 540, 563 [305 P.2d 20]. Although the law seems clearly to the contrary, appellants nevertheless assert that no confidential relationship existed between the parties and that a finding to such effect was erroneous. *O'Melia* v. *Adkins,* 73 Cal.App.2d 143 [166 P.2d 298], relied on by them is not in point since that decision rested on evidence that the asserted confidential relationship terminated with plaintiff's divorce from defendant who was sued through his executor and, therefore, did not testify.

As to the further affirmative defense that the two "releases" purportedly signed by plaintiff effectively foreclosed the maintenance of the instant action, once again we have a factual question resolved adverse to appellants' argument that his testimony as to this chapter of the litigation was inherently incredible. While extraordinary and unusual, we cannot say that it was unworthy of belief as a matter of law. The trial court found "That the plaintiff at no time for a valuable consideration, released or relinquished to the defendants all of his present and future rights, title and interest in and to the parcel of land which is the subject of the First Cause of Action" (Finding No. 7); and further found "That the joint venture . . . which is the subject of the First Cause of Action was not dis-

solved or terminated by any release signed by plaintiff." (Finding No. 8.) The effect of such findings is that "If it was [defendants'] intention to obtain a release from the consequences of the very frauds they were committing, of which [plaintiff] was ignorant, and if they incorporated in it language designed to accomplish that purpose, this in itself, would have constituted a fraud upon plaintiff, rendering the release[s] void and rescission unnecessary." (*Sime* v. *Malouf,* 95 Cal.App.2d 82, 110 [212 P.2d 946, 213 P.2d 788].)

Despite appellants' extensive arguments on all assignments of error heretofore discussed, we are not persuaded that any is sustainable. ▮ Appropriate to the whole problem is the following from *Vogelsang* v. *Wolpert,* 227 Cal.App.2d 102, 110 [38 Cal.Rptr. 440]: "Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims, the function of the trial judge in fraud cases is particularly significant. It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision. [Citations.]

"As a determination of the existence of fraud is particularly within the decisional field of the trial judge, the appellants are attempting to swim upstream against a strong current of authority when they maintain that there was no such showing in the long record, and in effect that this court should pass again upon the factors which the trial court found to be indicative of fraud."

Appellants' fourth point criticizes 15 of the 16 findings made upon the ground either that they are conclusions of law or that they contain the omnibus recital that certain allegations in the complaint and answers are true and untrue, as the case may be. ▮ However, "It is well settled that a general finding that all of the allegations of a pleading are true or untrue is sufficient. [Citations.]" (*Berven Carpets Corp.* v. *Davis,* 210 Cal.App.2d 206, 216 [26 Cal.Rptr. 513].) ▮ Too, it seems to us that the pertinent recitals in the findings may not properly be described as conclusionary in character but as recitals of the ultimate facts; hence, as is further well established, if the specific facts therein set forth are supported by the evidence no ground for reversal results. (*Estate of Kerr,* 127 Cal.App.2d 521 [274 P.2d 234].) Appellants also complain that the trial court erroneously failed to make special findings proposed

by them pursuant to section 634, Code of Civil Procedure. As in *Coleman Engineering Co.* v. *North American Aviation, Inc.,* 65 Cal.2d 396, 410 [55 Cal.Rptr. 1, 420 P.2d 713]: "We have examined the findings of the trial court in the light of the criticisms made in defendant's brief and are satisfied that the findings sufficiently dispose of all of the basic issues raised. The findings proposed by defendant, insofar as they may be deemed additional findings and are not directly contrary to the findings made, deal with evidentiary matters and, even if the matters therein were found in favor of defendant, would not require judgment in its favor. Section 634 of the Code of Civil Procedure does not require that a finding be made as to every minute matter on which evidence is received at the trial, and under the circumstances the refusal of the court to make specific findings on every matter proposed in defendant's counter-findings does not require a reversal of the judgment."

Appellants finally assert that the trial judge prejudged the evidence and otherwise demonstrated prejudice to their cause which denied them a fair hearing. Neither of the above claims has merit. The trial was a bifurcated one; it commenced on May 10, 1968, and evidence was taken through May 14, on which date it was continued to December 2, 1968, for the reason (as stated by the judge in open court) that "the matter is in the process of being settled." The parties were not able to effect a settlement, and the matter was thereafter advanced for trial from the December date to July 12, 1968. Present counsel for defendants was substituted on July 9 and trial resumed on July 12 after the denial of a motion by substituted counsel for a three weeks' continuance. No complaint is made that defendants were prejudiced by the above ruling, nor is it asserted that there was any rancor between the court and counsel; on the contrary, appellants' brief states that "the court treated defendant's counsel cordially and with courtesy and patience." The situation is otherwise, however, as it pertains to the court's attitude toward defendant Louis Kahn. There was sharp inquiry by the court of this defendant during one of the sessions which tended to indicate his disbelief in the credibility of the witness. But, "It is the duty of a judge when acting as the trier of the facts to pass upon the credibility of witnesses, and if he believes that a party has testified falsely, and chooses to say so rather than remain silent, he is not disqualified from proceeding to render judgment." (*Keating* v. *Superior Court,* 45 Cal.2d 440, 444 [289 P.2d 209].) Other asserted statements, *aliunde* the record and indicative of his hostility, are attributed to the trial judge; they are mentioned in an affidavit supporting a motion for new trial (subsequently denied) and are urged in the brief to be of merit because no counteraffidavit was filed. However, there is no requirement that a counteraffidavit be filed for the trial court to exercise its

discretion in ruling on, and denying, a motion for a new trial. (*Kyle* v. *Stone*, 234 Cal.App.2d 286 [44 Cal.Rptr. 390].)

Although we have carefully canvassed the entire record in regard to the instant claims, we find nothing which even approaches that found in *Rosenfield* v. *Vosper*, 45 Cal.App.2d 365, 371 [114 P.2d 29], and other decisions cited in appellants' brief. If the court possessed the feelings toward defendant Louis Kahn which are set forth in the brief, it might have been logically argued that he demonstrated such hostility by erroneously assessing punitive damages; but there is not one word of criticism as to such award or the amount thereof in a brief encompassing some 120 pages.

The judgment is affirmed.

Thompson, J., and Gustafson, J., concurred.

A petition for a rehearing was denied June 16, 1970, and appellants' petition for a hearing by the Supreme Court was denied July 16, 1970.