[Nos. B001373, B014209, B023085. Second Dist., Div. Five. May 8, 1987.]

ROSENFELD, MEYER & SUSMAN et al., Plaintiffs and Appellants, v. PETER R. COHEN et al., Defendants and Appellants.

**COUNSEL**

O'Melveny & Myers, William W. Vaughn, James W. Colbert III and Richard B. Goetz for Plaintiffs and Appellants.

Peter R. Cohen, in pro. per., Edward J. Horowitz, Rodi, Pollock, Pettker, Galbraith & Phillips, Thomas P. Phillips and Sonja A. Inglin for Defendants and Respondents.

**OPINION**

EPSTEIN, J.*—In *Rosenfeld, Meyer & Susman* v. *Cohen* (1983) 146 Cal.App.3d 200 [194 Cal.Rptr. 180] (hereafter *RMS I*), we considered the obligations of dissolving partners of a partnership at will to the other partners

---

*Assigned by the Chairperson of the Judicial Council.

for carrying on business that had been an asset of the partnership. We concluded that under the facts of the case as presented, the dissolving partners owed a fiduciary duty to the former partners with respect to such business. We also held that this duty is not dependent upon whether the client had retained the dissolving partners before or after the dissolution. In either case, the work retained its character as "unfinished business" of the dissolved partnership.

RMS I reached this court essentially without trial;[1] orders granting motions for partial summary judgment, judgment on the pleadings, and nonsuit had foreclosed the plaintiffs' theories of recovery. Finding these rulings to be erroneous, we reversed for further proceedings consistent with our opinion.

We now consider the several adjudications made in this complex litigation after the trial court rulings that were the basis of the RMS I decision. These are presented to us by appeals from three separate trial court adjudications, in 1983, 1985 and 1986. We also consider a cross-appeal from the 1983 adjudication. These appeals have been consolidated,[2] and we consider all of them in this opinion.

While the underlying facts are complex, we are aided by a detailed statement of decision issued by the trial judge in explanation of the 1983 adjudication. Only a few of his findings are challenged as not supported by substantial evidence. But there is sharp disagreement over the inferences and legal conclusions that ought to flow from these findings. We therefore present a limited discussion of the factual materials, except on those points that are challenged on the ground of insubstantial evidence in the record. For those issues, a fuller discussion is presented.

A detailed treatment of the procedural history of the case is necessary to an understanding of the issues presented in these consolidated appeals, and we begin with that discussion.

PROCEDURAL BACKGROUND

The body of litigation before the court in RMS I, and before us now, flows from disputes surrounding the dissolution of Rosenfeld, Meyer & Susman,

---

[1] Only one issue was actually tried to the court: whether the defendants had told a client of the dissolved partnership that they were essential to the client's representation, and that the other partners could not capably represent the client. The trial court found against plaintiffs on that issue. (146 Cal.App.3d at p. 221.)

[2] The appeal and cross-appeal from the 1983 judgment bear our docket No. B001373; the appeal from the 1985 adjudication is No. B104209; and the 1986 appeal is No. B023085.

an at-will law partnership. The dissolution occurred when two partners, Mr. Cohen and Mr. Riordan[3] (hereafter C&R) withdrew from the firm and formed their own partnership, Cohen and Riordan. The other partners later sued the dissolving partners, claiming that their acts in causing the dissolution were tortious. They sought damages, an accounting for fees derived from handling unfinished business of the dissolved partnership, and for other relief.[4] They also sued International Rectifier Corporation (hereafter Rectifier), a major client that had retained C&R after the dissolution. C&R cross-complained against the other partners, seeking an accounting for unfinished business wound up by them. They also sued the three name partners for fraud based on concealment of profits derived from the sale and rental of property to the dissolved partnership.

The RMS complaint and the C&R cross-complaint were severed for separate trials, with the RMS causes of action tried first. The adjudication in that case was the basis of our opinion in *RMS I.*

The C&R cross-complaint was tried while the judgment on the RMS complaint was on appeal. That trial, which concluded in 1983, resulted in an adjudication that C&R were entitled to share in the winding up proceeds realized by RMS on the basis of the interest of C&R in the dissolved partnership (two-seventeenths). The court also found each of the name partners liable to C&R for fraud. RMS and the name partners have appealed from that adjudication, and C&R have cross-appealed, challenging the trial court's allowance of deductions from the gross proceeds realized by RMS, and its denial of prejudgment interest on fee income owed to C&R. The trial court entered its judgment on these matters in June 1983, and we refer to it as the 1983 judgment.

One of the provisions of the 1983 judgment reserved jurisdiction to decide entitlement to later-acquired winding up income. The major item outstanding at that time was the quantum meruit recovery from Rectifier. Once that amount became known, proceedings were instituted to determine the amount to be credited against the recovery for the costs in obtaining it, and to allocate the net proceeds. A supplemental judgment on these issues was entered in May 1985 (the 1985 judgment). RMS has appealed from that adjudication.

---

[3]Mr. Riordan died after the partnership dissolution. His interests are represented in these proceedings through the administratrix of his estate.

[4]The name of the dissolved firm, Rosenfeld, Meyer & Susman, was retained by the partners who remained after the departure of Cohen and Riordan. The predissolution and postdissolution partnerships were, of course, different entities. For ease of reference, however, we will use the abbreviation RMS to refer to the predissolution partnership, which continued in existence for the purpose of winding up its unfinished business. (Corp. Code, § 15030.)

Our decision in *RMS I* was announced shortly after the 1983 judgment. Pursuant to the order on remand, RMS's lawsuit against C&R came on for trial in 1986. The trial court concluded that the 1985 judgment collaterally estopped RMS from any entitlement to relief on its complaint against C&R, and its judgment in favor of C&R on those issues was entered in September 1986 (the 1986 judgment). It is the subject of the final appeal before us now, by RMS.

## FACTUAL BACKGROUND

As we have seen, there was almost no fact adjudication in the original RMS trial. But RMS's three tort causes of action against C&R, asserted in the original case, were reasserted as defensive matter against C&R in the 1983 trial of the C&R cross-complaint. RMS argued that the alleged tortious behavior of C&R in dissolving the partnership amounted to unclean hands, a defense to an equitable suit for an accounting. We will have more to say about the pertinence of that defense and the findings made with respect to it later in this opinion. We note it now because the issues tendered by RMS were fully tried and resulted in extensive findings by the court.

■ In our review of the facts of this case we are, of course, guided by the familiar rule that "in examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding." (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)

### The Partnership

RMS was formed in 1965, and was the successor to an earlier partnership. During the predissolution period pertinent to this litigation, it consisted of 17 partners, including C&R. Since it was a partnership at will, without a formal partnership agreement, each of the partners owned an equal one-seventeenth share of the firm. (Corp. Code, § 15018, subd. (a).)

The firm enjoyed a successful entertainment law practice. Many of its entertainment clients had retained the firm on a "percentage fee" basis. Under that arrangement, the firm represented the client in negotiating an agreement for a particular entertainment project, and received its fee in the form of a percentage of the gross income earned by the client from the

project. In such cases, the fee was considered to have been earned upon completion of a successful negotiation—i.e., when the deal was made—even though the firm often did not receive its fee income until much later.

The firm also performed services on other bases of compensation: hourly and periodic rates, fixed fee, and contingent fee.

## The Rectifier Litigation

The principal contingent fee client pertinent to this litigation was Rectifier, which RMS represented in a major antitrust case. The RMS-Rectifier fee arrangement provided for hourly fees of $30 an hour, up to 1,000 hours a year for five years, against a contingent fee amounting to one-third of the eventual recovery. The *Rectifier* case (herein Rectifier) was assigned to C&R. It occupied the bulk of their professional effort for some five years, during which they continued to receive their full partnership draw, although their work produced little income for the firm at the time.

A disagreement over compensation arose in late 1973. At one point, the parties agreed to a resolution of the dispute, but it was repudiated by RMS partners a few days later. No further agreement was reached. As a result of the unresolved dispute, C&R withdrew from the firm, effective April 30, 1974, thereby dissolving the partnership. In mid-May 1974, Rectifier discharged RMS from further representation in the antitrust litigation, and retained C&R.

RMS's tort suit against C&R, filed after settlement of the Rectifier antitrust suit, was predicated upon allegations that C&R had dissolved the partnership in bad faith, and had interfered with RMS's contractual relations. Among other allegations, RMS claimed that C&R had dissolved the firm in order to take over the *Rectifier* litigation for themselves, and had told Rectifier that RMS was incapable of handling the case without them.

These allegations were litigated in the context of RMS's unclean hands defense to the C&R cross-complaint. The trial court found that C&R had not dissolved the partnership in bad faith and had committed no impropriety in connection with Rectifier's decision to transfer the litigation from RMS to C&R. The court found that "[n]either Cohen nor Riordan breached any trust or any fiduciary duty owed to [RMS]."

C&R handled the Rectifier antitrust litigation to completion. The case was eventually settled for $33 million and certain patent licenses. C&R's fee from Rectifier amounted to $2,450,516.

Upon completion of the *Rectifier* litigation, RMS pursued its quantum meruit suit for services rendered to Rectifier up to the point of its discharge in mid-May 1974.)[5] See *Fracasse* v. *Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d. 9]) That litigation was eventually settled for $7,076,181.

Most of the litigation before us concerns the parties' competing claims to these fee proceeds.

*RMS's Costs and Expenses in the Rectifier Litigation*

Over the course of the litigation, RMS retained three separate law firms to represent it in its litigation against Rectifier. Fee arrangements with these firms varied, but they were predominantly contingent fee arrangements: the firm would receive a percentage of the amount received from Rectifier. In exchange for that compensation, the retained firms were to not only pursue RMS's claim against Rectifier, but also handle the offensive and defensive litigation with C&R. In fact, the initial suit by RMS joined its two causes of action against Rectifier (quantum meruit and tort) with its three causes of action against C&R based on the latter's alleged tortious conduct in dissolving the partnership and in acquiring the Rectifier account.

Little or no effort was made by any of the retained firms, or by RMS, to allocate fees or time expended as between the *Rectifier* and the C&R litigation.

RMS claimed over $1.5 million in attorney fees, and an additional amount for costs. The trial court was of the view that it was RMS's burden to establish the amount of the fees and costs incurred that was attributable to the litigation against Rectifier, as opposed to the litigation with C&R. The trial court found that the tort claim against Rectifier, and the latter's affirmative defense against RMS lacked merit and were subject to easy if not summary disposition, and that the amounts claimed for fees and costs were excessive in any case. The court recognized $51,000 in costs attributable to the *Rectifier* suit, and allowed $300,000 as reasonable attorney fees. Thus it ruled that the entire amount of the recovery from Rectifier, less only $351,000, should be divided equally among the 17 partners.

*Allocation of Income From Percentage Fee Clients*

RMS collected $6,178,064 from percentage fee clients who had retained

---

[5]RMS also sued Rectifier in tort, and Rectifier asserted breach of fiduciary duty on the part of RMS as a defense to the quantum meruit cause of action. Neither of these theories had merit, and both were eventually rejected by the court.

the firm before April 30, 1974. To the extent that these fees were attributable to negotiations concluded before that date, they were "earned" before the dissolution, and subject to division among the 17 partners.

The court found that partners of RMS responsible for keeping the books and accounts knew that the firm's record keeping would not permit allocation of fee income by entertainment project, and hence would not reveal the amount of fees that were earned before the dissolution. The court also found that these partners knew that RMS would ultimately have to account for fees earned before the dissolution, but chose to establish the books in such a way as to make it impossible to render an accurate accounting for percentage fees received after April 30, 1974. They did so, the court found, in order to foster an erroneous theory that there was no work-in-process for percentage fee clients. It would have been possible, with a minimum effort, to set up the books in such a way as to allow attribution of fees to the period in which they were earned. The court found that, under the circumstances, the failure to instruct the accounting department of the firm to do this was malicious and fraudulent.

From this, the trial court concluded that it was RMS's burden to establish the amount of these fees attributable to postdissolution work. With the exception of $409,447 in fees, RMS was unable to meet that burden, and the court concluded that the entire balance, consisting of $5,768,617, was available for allocation among the 17 partners.

*Compensation for Physical Assets, and Fraud by Concealment of Profits From Sale and Rental of Physical Assets*

RMS challenges the trial court's award of compensation for physical assets to C&R, and both it and the name partners challenge the finding that the name partners were guilty of actionable fraud. The facts pertinent to these issues do not materially bear on other issues in the case, and we will discuss them as part of our treatment of these particular contentions.

ISSUES ON APPEAL

A. Issues on the C&R Cross-complaint

1. Whether the trial court should have offset recovery to C&R for winding-up fees received by RMS, by the amount of similar fees received by C&R.

2. Whether the trial court erred in its allocation of burden of proof, and in its ultimate allocation, with respect to percentage fee income received by RMS.

3. Whether the trial court erred in its award of compensation for physical assets to C&R.

4. Whether the trial court erred in its allowance of fees and expenses for the RMS quantum meruit recovery against Rectifier.

5. Whether C&R are entitled to prejudgment interest for their share of percentage fees collected by RMS.

6. Whether there is substantial evidence to support the finding of fraud, and whether the fraud cause of action is barred.

B. Issues on the RMS Complaint

1. Whether any of RMS's causes of action are precluded by collateral estoppel.

2. Whether RMS's action for an accounting is precluded by collateral estoppel.

We will conclude that the decisions of the trial court are correct and should be affirmed, subject to the modification that we discuss, with a single exception: the preclusion of a trial on RMS's action for an accounting. These conclusions make it unnecessary to consider other arguments raised by the parties.

DISCUSSION

A. *Issues on the C&R Cross-complaint*

1. Failure to Offset for Winding Up Fees Received by C&R

■ According to RMS, the "principal and most obvious error" in the judgments on appeal is that the trial court entertained C&R's claim for their share of fees received by RMS for winding up partnership work in progress, but refused to consider the corresponding claim of RMS for winding up fees received by C&R; in short, that the trial court "failed to consider both sides of the ledger." It did so, RMS claims, because of its erroneous view that the *Rectifier* case lost its character as unfinished business of the partnership when Rectifier terminated RMS as its counsel. They point out that the essential holding of *RMS I* is that this view is erroneous, but suggest that the trial court was unaware of the error because *RMS I* was not decided until months after the 1983 judgment on the C&R cross-complaint.

The short answer to this argument is that the C&R action for an accounting had been severed from the RMS proceeding for an accounting and tort damages. The latter was on appeal at the time of the trial on the cross-complaint, RMS having suffered an adverse decision in the trial court. Given that posture of the case, the trial court was in no position to try the merits of RMS's claims for winding up fees received by C&R.

Obviously, the trial court was aware of this. The trial judge who presided over the C&R cross-complaint also had presided over the trial of the RMS action, then on appeal. It is true that he was of the opinion that Rectifier's discharge of RMS and retention of C&R to represent it in the antitrust litigation ended the unfinished business character of that representation; that was the principal basis for the judgment then on appeal, and a similar conclusion is expressed in the statement of decision for the 1983 judgment. But none of this changes the fact that the RMS claim for a share of C&R's fee from Rectifier was neither pleaded as a defense to the cross-complaint, nor was it tried. The issue was simply not before the court in that trial.

It is unfortunate that the C&R cross-complaint was tried before our decision on the RMS appeal, then pending. Since these were cross-actions for an accounting, it would have been far better to try "both sides of the ledger" at once. (See *Davis* v. *California Motors* (1946) 73 Cal.App.2d 241, 245 [166 P.2d 52]; *Prince* v. *Harting* (1960) 177 Cal.App.2d 720, 732 [2 Cal.Rptr. 545] ("[e]quity does nothing by halves").)

The record is far from clear as to which side was pressing for an immediate trial on the cross-complaint, and which was urging delay. It does not appear that either side was entirely consistent in its position at the time. However that may be, the C&R cross-complaint was tried, and, as we will discuss, the decisions of the trial court on the issues it presented are supported by substantial evidence and are legally correct. In a later portion of this opinion, we conclude that the RMS suit for an accounting is still viable, and must be tried.[6]

We see no reason to disregard the results of the lengthy trial on the C&R cross-complaint. But it would be inequitable in a partnership accounting case, to require that some partners pay the claims of other partners before their own offsetting claims are adjudicated. The proper procedure is to resolve all of the competing claims, and then render a net judgment, after offsets, in favor of the partners with the greater claims. (See *Prince* v. *Harting, supra,* 177 Cal.App.2d, at p. 733.)

---

[6]See the discussion on pages 1062-1063 of this opinion, *infra.*

We will therefore modify the 1983 and 1985 judgments so that this result may be achieved. We wish to make it clear, however, that the C&R's entitlement with respect to its "side of the ledger" has been fully tried, and the issues determined in the adjudicated cross-complaint are not set at large by our decision.

Finally, RMS argue that the trial court's error about the effect of Rectifier's change of counsel tainted the entire 1983 judgment, requiring a plenary reversal. How this permeation occurred is not explained. The trial court provided detailed findings of facts in its 1983 decision, none of which is dependent upon the unfinished business character of the *Rectifier* litigation.

2. Percentage Fee Income

 a. Initial Decision

 The disputed percentage fees derive from the partnership's share of clients' income on entertainment projects negotiated by the firm before its dissolution. There is no doubt about the unfinished character of these fees. The problem is that many of the clients whose fees are at issue had multiple projects negotiated by RMS, and, with only a few exceptions, RMS bookkeeping did not permit a differentiation between fees attributable to projects negotiated before and after the dissolution.

The evidence also established that it would have been a simple matter for RMS to differentiate percentage fees according to the project that generated the income. Even if the clients' remissions of percentage fees did not make that allocation, the firm could have made a contemporaneous inquiry of the client in order to secure the necessary information. In fact, there was evidence that RMS's outside accounting firm and one of its accounting department employees tried to make some allocations of this kind, but were then ordered to cease efforts in that direction. From this and other evidence, the trial court concluded that members of the firm had deliberately established methods of accounting in a way that would make it impossible to differentiate predissolution and postdissolution percentage fee income, and that they had done so in order to frustrate C&R's ability to prove up their share of this class of unfinished business income. That conduct, the court found, was willful and malicious.

The trial court concluded that, under the circumstances, C&R was entitled to use the gross amount of percentage fee income as the base for computing their share, less the amount of such fees that RMS could show to be attributable to postdissolution legal services. Given the evidence before the trial court, which supports its findings of fact, this determination was correct.

■ Corporations Code section 15021, subdivision (1), a part of the Uniform Partnership Act, provides that "[e]very partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction . . . of the partnership or from any use by him of its property." Corporations Code section 15022 gives partners a right to a formal account as to partnership affairs.

These statutes, and the common law fiduciary obligations of partners, imposed a duty on the RMS partners who received unfinished fee income to accurately account for it. (*Mashon* v. *Haddock* (1961) 190 Cal.App.2d 151, 165 [11 Cal.Rptr. 865].)

The position of RMS was not unlike that of other trustees who fail to keep proper records of the dates and amounts of receipts and expenses; such fiduciaries have the burden of establishing that data and, upon their failure to do so, a computation may be made on the basis of gross receipts, even though that approach is unfavorable to them. (See *Purdy* v. *Johnson* (1917) 174 Cal. 521, 530 [163 P. 893]; *Kennard* v. *Glick* (1960) 183 Cal.App.2d 246, 250 [7 Cal.Rptr. 88]; *Larkin* v. *Jesberg* (1961) 191 Cal.App.2d 272, 277 [12 Cal.Rptr. 655].)

■ The Evidence Code provides that, ordinarily, the burden of proving an issue lies with the party for whom the existence or nonexistence of the disputed fact is essential. (Evid. Code, § 500.) But the code also provides that this basic rule is subject to exceptions "as otherwise provided by law," including both statutory and case law. The official Law Revision Commission comment on this section states that "[i]n determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or non-existence of the fact." (See generally, 1 Witkin, Cal. Evidence (3d ed. 1986) § 136, p. 119; 2 Jefferson, Evidence Benchbook (2d ed. 1982) § 45.1, p. 1643; and see *State of California* v. *City and County of San Francisco* (1979) 94 Cal.App.3d 522, 530 [156 Cal.Rptr. 542] (once plaintiff proved an illegal discharge into state waters, defendant had the burden of showing that the penalty should be less than the statutory maximum).)

■ Surely, where a fiduciary has a legal duty to allocate receipts between those in which its beneficiary has some interest and those in which the beneficiary has none, and is fully and singularly capable of making that allocation but fails to do so, a court is justified in calling upon the fiduciary to bear

the burden of differentiation at trial. This is true, a fortiori, where the fiduciary's failure is deliberate and for the purpose of frustrating recovery by the beneficiary. The evidence supports the trial court's finding of these predicate facts in this case.

Except for a few accounts, for which RMS did prove that percentage fee receipts were the product of postdissolution work, RMS failed to bear its burden at trial. As a result, the trial court correctly used the balance of the percentage fee income as the base for allocating the partners' shares.

b. Motion to Reopen

After the trial court announced this result in its tentative statement of decision, RMS moved to reopen the trial in order to present evidence on the issue. The court denied this motion, a ruling the RMS argues was an abuse of discretion.[7]

Trial courts have broad discretion in deciding whether to reopen evidence. (See *Vangel* v. *Vangel* (1953) 116 Cal.App.2d 615, 627 [254 P.2d 919].)

In this case, RMS claimed that its attorney had misunderstood that his side might bear the burden of proof on differentiating percentage fee income. It offered the declaration of an accountant who had sat through the trial. In it, the accountant said that he had made a computer run using clients' files as the basis for an assumption about start dates for various entertainment projects; that this run had eliminated a substantial number of the projects included in the gross percentage fee allocations used by C&R's expert; and that, given time, he could verify his assumptions and obtain further information from clients that would lead to further corrections.

The motion to reopen was made nearly two months after the trial court's tentative statement of decision. As that court noted in denying the motion, a trial brief filed by RMS some three months before had recognized that the burden of proof might shift to RMS, RMS's expert had been aware of the

---

[7]RMS points to Code of Civil Procedure section 662 as authority for the trial court to reopen the evidence. That section provides that, "[i]n ruling on such motion [i.e., a motion for *new trial*], in a cause tried without a jury, the court . . . , in lieu of granting a new trial, may vacate and set aside the statement of decision and judgment and reopen the case for further proceedings and the introduction of additional evidence . . . ." Since RMS's motion was made before judgment, section 662 is not applicable. Instead, RMS's motion invoked the court's fundamental authority to control the order of proof and the conduct of proceedings before it. (Evid. Code, § 320; Code Civ. Proc., § 128, subd. (a)(3).) Like other discretionary powers, this authority is subject to abuse, and both the claim and effect of abuse are reviewable in a proper appeal.

necessity of obtaining information that would support a differentiation, and information bearing on that issue had been denied to C&R. The court concluded that the failure to introduce evidence on the differentiation issue was neither inadvertent nor excusable, but was the product of a knowing and informed choice of trial tactics.

There was no abuse of discretion in denying the motion to reopen the evidence.

3. Physical Assets

 a. Inclusion in Capital Accounts

█ RMS argues that the trial court's decision results in a double recovery to C&R for physical assets of the firm (furniture and furnishings, the law library, and similar properties). The basis for the argument is the claim that C&R's share of these assets was reflected in their capital accounts, which were paid to them upon their withdrawal from the firm.

The evidence established that recognized accounting practices for law partnerships call for the inclusion of each partner's interest in physical assets of the firm in the partner's capital account. But the evidence also supported the trial court's implicit conclusion that this practice was not followed at RMS and that, instead, each partner's capital account consisted of his partnership draw entitlement for the year, less the amount drawn to date.

Under these circumstances, there obviously was no error in awarding C&R their share of the physical assets, even though they had been paid the balances in their capital accounts.

 b. Valuation of Physical Assets

█ The court valued the physical assets at their book value, $508,163. That figure was based on the cost of the assets to SRM, Inc., (hereafter SRM) the entity that had purchased the assets and leased them to the firm.[8] SRM eventually sold the assets to the firm, for $88,753, in 1974.

The physical assets had been purchased at various times before 1974. The principal evidence of their market value is in the deposition testimony of a RMS partner, who was apparently knowledgeable on the subject. The focus of his testimony was the fairness of the 1974 sale price to RMS. He testified

---

[8]SRM, Inc., was a corporation wholly owned by the name partners of RMS. (See discussion of fraud at p. 1057 of this opinion, *infra*.)

that the price was fair because the cost of the library books was not included in the sale price formula, the furniture had actually increased in value and, most significantly, that, overall, the assets "undoubtedly had a value in excess of book value." There was no evidence to the contrary. Nor was there any objection to or limitation on the use of this evidence.

This evidence is sufficient to support the trial court's conclusion that the physical assets were worth their book value at the time they were sold to the partnership by SRM. The evidence of value being sufficient, we cannot disturb the finding on appeal. (See *Gudel* v. *Ellis* (1962) 200 Cal.App.2d 849, 857 [19 Cal.Rptr. 751].)

4. Allowance of Costs and Expenses Against the Quantum Meruit Recovery

a. Appeal by RMS

RMS argues that the trial court erred in refusing to deduct the full amount of attorney fees and expenses paid to counsel who successfully litigated and settled the quantum meruit action against Rectifer. That suit sought to recover the reasonable value of services by RMS up to the mid-May 1974 discharge of the firm by Rectifier.[9] (See *Fracasse* v. *Brent, supra,* 6 Cal.3d 784.)

The difficulty with the RMS position is that the fees paid to retained counsel compensated them not only for work on the *Rectifier* case, but also for the prosecution and defense of the litigation with C&R. The record before us demonstrates that the litigation with C&R was complicated and protracted. Unfortunately, virtually no effort was made by RMS or its counsel to differentiate between time and expenses attributable to the *Rectifier* litigation, and the litigation with C&R. Under those circumstances, the trial court properly refused to credit the amount paid to counsel retained by RMS. Instead, it reviewed the issues, difficulty and other circumstances of the *Rectifier* litigation, and recognized $300,000 as a reasonable amount for attorneys fees, and $51,000 for costs. The approach of the trial court was proper, and we cannot say that the determination was an abuse of discretion.

b. Appeal by C&R

C&R have cross-appealed from that part of the 1985 judgment that allows any credit to RMS for its costs and expenses in the *Rectifier* litigation.

---

[9]Because C&R withdrew from the firm on April 30, 1974, and Rectifier did not discharge RMS for another two weeks, RMS was entitled to deduct the reasonable value of services rendered on the *Rectifier* case during that period. However, the trial court found that no substantial or measureable amount of work was done by RMS during that time.

C&R also urge that RMS be directed to indemnify them against a future claim that they say might be brought on a "common fund" theory by one of the attorneys who represented RMS in the *Rectifier* litigation.

We find no merit in either contention.

The disallowance of credit is based on the trial court's findings that RMS acted improperly in its dealings with C&R. But there is no basis to entirely forfeit RMS's legitimate and proven expenses incurred in securing quantum meruit recovery for the benefit of *all* the partners, including C&R. Corporations Code section 15018, subdivision (f) expressly allows compensation to a "surviving partner," a status held by RMS with respect to the quantum meruit recovery against Rectifier. A party guilty of inequitable conduct is not necessarily barred from any judicial relief, nor are equitable defenses such as unclean hands a basis for exacting perpetual retribution by the aggrieved party. (See *Sheppard* v. *Wilcox* (1962) 210 Cal.App.2d 53, 62 [26 Cal.Rptr. 412].)

Finally, there is simply no authority for C&R's present claim for indemnity to protect them from an action that they speculate another attorney might bring against them in the future.

5. Prejudgment Interest

The trial court refused to award prejudgment interest to C&R on account of percentage-fee income due, ruling that C&R had made an election under Corporations Code section 15042 to share in profits instead.[10]

The court found that the RMS defendants, as winding up partners, retained exclusive possession of the books and records of the dissolved partnership, and continued the former partnership business under the same name, at the same place, and with the same clientele, all without settlement of accounts with C&R.

---

[10]Corporations Code section 15042 provides: "When any partner retires or dies, and the business is continued under any of the conditions set forth in Section 15041(1, 2, 3, 5, 6), or Section 15038(2b) without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; provided, that the creditors of the dissolved partnership as against the separate creditors, or the representative of the retired or deceased partner, shall have priority on any claim arising under this section, as provided by Section 15041(8) of this act."

That entitled C&R to elect either a share of postdissolution profits attributable to the use of their rights in the assets of the former partnership, or payment of prejudgment interest. The dissolution occurred on April 30, 1974. Nearly nine years later, on February 11, 1983, C&R announced their election to receive prejudgment interest in lieu of profits.

This election came too late, as the trial court also found. C&R's position throughout the trial, before the trial, and even now, has been and is to demand their full two-seventeenths share of all winding up fees derived by RMS. This conduct amounted to an election to receive profits in lieu of interest, as the trial court correctly concluded.

The court based its decision on *Vangel* v. *Vangel* (1959) 51 Cal.2d 510, 522 [334 P.2d 863]. It believed the result to be inequitable, but inevitable under the holding of that case.

The *Vangel* decision is the last in a series of three appellate decisions, reviewing four separate trials, arising over the dissolution of a citrus ranch partnership. One of the partners, Charles Vangel, was awarded a 23.96 percent interest in the net worth of the partnership. He was allowed to participate in the profits of the 1952-1953 crop, and his share of the value of the partnership, including the profits, was deposited into escrow in September 1953. The Supreme Court rejected Charles's argument that he could not be put to an election between interest and profits until the amount due to him was finally settled.

The opinion then addressed the question of interest entitlement for the period before the escrow deposit: "Charles also claims that he is entitled to interest on the amount found to be due him until that amount is either paid, or made available to him. From what has been heretofore said it is obvious that there is no merit to this argument." (51 Cal.2d, at p. 522.)

■ It is clear from this construction of Corporations Code section 15042 that the election to participate in profits precludes an award of interest under Civil Code section 3287, subdivision (a) (prejudgment interest on liquidated amounts). Instead, the statute allows *either* interest or participation in profits, but not both, to a partner whose partnership assets are used by the winding up partners.

■ C&R argue that section 15042 applies only to tangibles (such as the citrus grove and fruit in the *Vangel* case), and not to intangibles such as the partnership assets used in this case. None of the cases cited by C&R support that distinction,[11] and we see no proper way to recognize it by construction, given the plain language of the statute.

---

[11] *Ruppe* v. *Utter* (1925) 76 Cal.App. 19, 24 [243 P. 715]; *Vangel* v. *Vangel* (1955) 45 Cal.2d 804, 808 [291 P.2d 25, 55 A.L.R.2d 1385]; *Urzi* v. *Urzi* (1956) 140 Cal.App.2d 589, 592 [295

6. Fraud

a. Basis for Finding

As we have seen, the name partners of RMS were the sole owners of another entity, SRM, which leased and later sold physical assets, and leased office space, to the partnership. SRM was formed in 1961, when the RMS firm later dissolved by C&R was formed. Its purpose was to insulate a partner of the predecessor firm from personal liability on the lease of office space used by the firm. SRM became the lessee of the office space and subleased it to RMS. The court found that the name partners charged the firm 110 percent of their costs for the lease rental and for furniture, furnishings and other physical assets. The trial court found that the name partners deliberately concealed from C&R the facts that title to the assets (other than the lease) was held by SRM rather than the partnership, and that they were using SRM to derive a 10 percent profit.

Based on these and related facts, the trial court found that the name partners were personally guilty of fraud, and assessed compensatory and punitive damages against them. The name partners argue that there was no concealment, and hence no fraud, because the 10 percent override was revealed in 1970, and that, in any case, the claim is time barred.[12]

b. The 1970 Document

In a trial brief presented during the litigation that led to the 1983 judgment, C&R acknowledged that they had been given a report by RMS's outside accounting firm, in 1970, that revealed the fact of the 10 percent override, that this report had been circulated to all partners, and had been specifically mentioned at a 1970 partners' meeting. RMS argues that these statements in C&R's trial brief amount to judicial admissions of the matter stated to be true, and are binding on C&R. RMS argues further that if it is

---

P.2d 539]; *Yeomans v. Lysfjord* (1958) 162 Cal.App.2d 357, 364 [327 P.2d 957]; *Casida v. Roberts* (1959) 51 Cal.2d 853, 855 [337 P.2d 829]; *Moore v. Moore* (1961) 190 Cal.App.2d 129 [11 Cal.Rptr. 659]; *Mashon v. Haddock, supra,* 190 Cal.App.2d at page 179; *Wickstrom v. Davis* (1957) 211 Ore. 254 [315 P.2d 597, 608]; *Timmermann v. Timmermann* (1975) 272 Ore. 613 [538 P.2d 1254]. In *Ruppe,* a pre-Uniform Partnership Law case, the court held that everything owned by the partnership, including an intangible such as goodwill, is an "asset."

[12]Aside from the 1970 revelation, the name partners are not able to challenge the sufficiency of evidence to support the finding of fraud. They do argue that a 10 percent override was fair compensation because the name partners bore a risk of loss if the firm dissolved, and that seven former partners testified that there had been no concealment. (Other partners testified to facts that support the inference of concealment.) "[B]ut," they conclude, "it is not these matters that form the grounds of this appeal."

conceded that there was no concealment, it must follow that there was no fraud.

C&R do not deny receipt of the accountant's report, nor do they dispute the argument that the statement in their brief is binding. But, they assert, they had neither read the report nor acknowledged reading it and, under the circumstances in which it was presented, they are not subject to constructive knowledge of its contents.

The report itself was never received in evidence. It surfaced only on RMS's motion to reopen the evidence after the trial court's preliminary statement of decision.[13] The trial court conducted a hearing on this motion, and denied it in a detailed statement on the record.

The report was circulated by one of the name partners in mid-1970, and concerned the allocation of 1969 net income to partners. The C&R brief in which receipt of the report is acknowledged also states that, by the time the report was circulated, the matter of 1969 net income was already "ancient history," having been discussed, agreed to and finalized about six months before. At the meeting at which the report was discussed, the name partner who had circulated it described it as a failure and a "waste of effort." Neither Cohen nor Riordan read it, simply because it was "ancient history." The fourth note to the report includes a statement that "the firm is obliged to pay SRM, Inc., a fee equal to 10 percent of the cost of leased property and 10 percent of the maintenance, rental and other related expenses incurred by SRM, Inc., for the year."

The trial court had the benefit of the briefs of the parties, and deposition testimony from both sides. In denying the motion to reopen, the court stated: "[The deposition testimony of Cohen] indicates that Cohen received a copy of the report, that he glanced through the profit and loss statement but did not read the footnotes and did not observe that footnote 4 of the report indicates that [RSM] had paid money to SRM Inc. . . . [The report shows RMS's] income and expenses for the calendar year ending 31 December 1968 and 31 December 1969. As of the date it bears—23 July 1970—[the report] was no longer of current interest because uncontradicted testimony shows that the partnership profits for those years had long since been determined, allo-

---

[13]It is not clear from the RMS briefs whether the trial court's decision not to reopen the evidence on the fraud issue is urged as an issue on appeal. At one point, RMS states that it offered to introduce the accountant's report, and that it had not done so before because its attorney understood the trial court to say that it required nothing further on the fraud claim. We have examined the record, and do not find that counsel was misled in any way. At any event, the contents of the report were sufficiently before the court to permit it to address RMS's argument about a judicial admission. Under the circumstances, there surely was no abuse of discretion. (See *Vangel* v. *Vangel, supra,* 116 Cal.App.2d, at p. 627.)

cated and distributed. It is unreasonable to infer that delivery of this document constituted actual notice to either of those busy trial lawyers of the contents of footnote 4 thereof . . . . The court finds that neither Cohen nor Riordan read said footnote.

"The court has considered Corporations Code section 15003 and believes that the only reasonable interpretation thereof is to restrict its application to circumstances reasonably calculated to give the recipient actual knowledge of the facts—circumstances not present herein.

"The proposed testimony of . . . Cohen . . . regarding the mention made of [the report] at a partnership meeting would have discouraged anyone from reading it. At that meeting . . . Rosenfeld is alleged to have described the report as a waste."

The court concluded that consideration of the proffered evidence would not have changed its determinations about the fraud issues.

What constitutes notice among fiduciaries is generally a question of fact. (See *Davis* v. *Kahn* (1970) 7 Cal.App.3d 868, 878 [86 Cal.Rptr. 872].) Section 4(2) of the Uniform Partnership Act (codified in Corp. Code, § 15004, subd. (2)) provides that the law of estoppel applies under the act. The official comment to this provision states: "A 'written statement' may be delivered in such a way as to induce the person to whom it is delivered to abstain from reading it. No one who has thus delivered a written statement should be permitted to claim the benefit of the notice."

In this case, the key "notice" was in a footnote to a report to which it was only tangentially related. By the time the report was distributed, it was of little current interest. And the name partner who had distributed it made statements that would discourage anyone from reading the report. Under these circumstances, the trial court could find that the fact that name partners were receiving a profit on the leases remained concealed. The evidence does not compel this conclusion, but it is sufficient to support it. As a reviewing court, we are bound by the trial court's resolution of the issue.

c. Statute of Limitations

The name partners and RMS argue that the fraud cause of action is barred by Code of Civil Procedure section 338, subdivision 4, which establishes a three-year limitations period for actions in fraud. But this statute runs from actual or inquiry notice. A fraudulent concealment, which the trial court found to have occurred in this case, delays commencement of the statutory time until such notice occurs. (*Sears, Roebuck & Co.* v. *Blade* (1956)

139 Cal.App.2d 580, 587 [294 P.2d 140]; *Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 232 [153 P.2d 325].)

In this case, the trial court found that there was neither inquiry nor actual notice to C&R until a partners' meeting in 1974, a date well before the statute of limitations had run on their 1976 cross-complaint.

B. *Issues on the RMS Complaint*

In response to the C&R cross-complaint, RMS asserted the substance of the three tort causes of action as an "unclean hands" affirmative defense. These issues were fully tried to the court, resulting in detailed findings of fact, and conclusions. RMS concede that, if given collateral estoppel effect, these findings preclude assertion of the torts as bases for affirmative relief. They argue, however, that the findings should not be given a preclusive effect and that, even if such effect is given, there is no bar to trial of their suit for an accounting.

By the time the RMS suit was set for trial, after our reversal and remand in RMS I, the court had fully tried the C&R cross-complaint, including issues that had been reserved at the first (1983) phase of those proceedings. Its judgment on the cross-complaint was itself on appeal. The trial court concluded that its findings and conclusions on the RMS "unclean hands" affirmative defense to the cross-complaint fully disposed of the issues presented in the RMS suit, leaving nothing to try. Accordingly, it awarded judgment to C&R, and RMS appeals.[14]

1. Preclusion of the RMS Tort Causes of Action

 RMS argues that the findings against it on the "unclean hands" affirmative defense may be disregarded because "that defense is insufficient as a matter of law." RMS says that the inapplicability of the defense was revealed by two cases decided after *RMS I.*

---

[14]RMS argues that it was error for the court to give collateral estoppel effect to a judgment then on appeal and not yet final, but acknowledges that should this court affirm the 1983 judgment, the error would be "cured" and the argument moot. Because of this, it disclaims this ground as a basis for reversal. We therefore need not discuss the application of cases that allow a court to treat an issue tried and resolved in a trial on severed issues as determinative of facts that bear on remaining issues to be tried. (See *Raedeke* v. *Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 [111 Cal.Rptr. 693, 517 P.2d 1157] (if trial on equitable issues leaves nothing to be decided on legal issues, they are foreclosed); *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 887 [92 Cal.Rptr. 162, 479 P.2d 362] (evidence at trial not limited unless Evid. Code, § 355 request is made).)

The first of these, *Jewel* v. *Boxer* (1984) 156 Cal.App.3d 171 [203 Cal.Rptr. 13], holds that, absent an agreement to the contrary, the rights of the members of a dissolved partnership to share in winding up fees received is dependent upon their interest in the partnership, not on the basis of a quantum meruit approach counting on the value of services rendered by the winding up partners. The only dicussion of bad faith in the case occurs in its treatment of our *RMS I* opinion. The *Jewel* court states that, while bad faith on the part of the dissolving partners was alleged, our holding should not be limited to bad faith cases. (156 Cal.App.3d, at p. 178.)

In the second case, *Fox* v. *Abrams* (1985) 163 Cal.App.3d 610 [210 Cal.Rptr. 260], we approved the holding in *Jewel,* and concluded that it applied to a law corporation. (*Id.,* at pp. 616-617.)

Neither case holds that bad faith of a partner of a dissolved partnership is irrelevant to the rights of that partner against other partners. ▮ We deal here with a suit for an accounting, an equitable proceeding (*Freeman* v. *Donohoe* (1923) 65 Cal.App. 65, 79 [223 P. 431]), to which equitable doctrines are applicable. (*Bates* v. *McTammany* (1938) 10 Cal.2d 697, 700 [76 P.2d 513].) One of these is the rule that "he who comes into equity must come with clean hands." (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 8, p. 5233.) The force of the doctrine in a particular case must depend on the circumstances of that case, and on proof that the misconduct is material to the subject matter of the litigation to which it is a defense. (Witkin, *op. cit. supra,* § 10, p. 5235.)

▮ The tortious if not unconscionable conduct alleged against C&R was material to C&R's claims for equitable relief against RMS. Having been pleaded, it was properly tried and determined.

That fact presents another, and more fundamental, reason why the trial court's determination should not be disregarded now. It was RMS that pleaded these matters as a defense, and both sought and received a full trial on all issues presented.

We dealt with a similar situation in *Wood* v. *Herson* (1974) 39 Cal.App.3d 737 [114 Cal.Rptr. 365]. In that case, the defendant to an unlawful detainer action challenged the plaintiff's title as a defense. This was an impermissible defense to the unlawful detainer action. Nevertheless, it was fully tried, and resolved against the defendant. Later, the defendant sued the unlawful detainer plaintiff for specific performance, alleging the same transactional circumstances that had been resolved against him in the unlawful detainer trial. The new defendant sought summary judgment on the basis of res judicata. It was granted and, on appeal, we affirmed:

"It was Woods who pleaded the affirmative defense in the unlawful detainer action that raised the same issues pleaded in the subsequent specific performance action. Herson was obviously willing to have the unlawful detainer action tried on all of the issues raised by Woods. As mentioned earlier it was a lengthy, detailed trial, including complete pretrial discovery. Woods, having lost, now want a second chance. . . .

"The rationale of the res judicata doctrine is well known. It seeks to curtail multiple litigation causing vexation and expense to the *parties* and wasted effort and expense in *judicial administration*. (4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 147, 3292.)

"This rationale explains the reason for applying the doctrine to this case. Clearly there will be no miscarriage of justice—Woods have had their day in court and because their first cause of action is identical to their affirmative defense, the trial court properly applied the doctrine of res judicata in granting the summary judgment on said cause of action. In *Saunders* v. *New Capital for Small Businesses, Inc.* [1964] 231 Cal.App.2d 324 on pages 330-331 [41 Cal.Rptr. 703], the court summarized the essential principles of the doctrine: ' "The doctrine of res judicata rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. Public policy and the interest of litigants alike require that there be an end to litigation." . . .' " (Original italics, 39 Cal.App. 3d, at pp. 745-746.)

See also *Gurrola* v. *County of Los Angeles* (1984) 153 Cal.App.3d 145, 151 [200 Cal.Rptr. 157] (determination in Gov. Code, § 911.2 late claim petition that claim was not timely presented was binding in later tort suit against government entity, even though excuse for not filing timely claim, rather than timeliness of claim filed, is the issue in late claim petition); *County of Los Angeles* v. *Superior Court* (1985) 169 Cal.App.3d 1095, 1100 [215 Cal.Rptr. 699] (follows *Gurrola*).

We conclude that the adverse adjudication of RMS's unclean hands defense in the 1983 judgment precludes its assertion of tort causes of action based on the same theories and facts.

2. Preclusion of RMS's Suit for Accounting

 While we have agreed that the findings embodied in the 1983 judgment preclude trial of RMS's tort causes of action, we find no basis for preclusion of its suit for an accounting. None of RMS's three causes of action

was labeled as a suit for accounting, but sufficient facts were pleaded to entitle RMS to an accounting, and an accounting was specifically requested. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 367, p. 420.)

The findings adverse to RMS, which were made as a result of the trial on the 1983 cross-complaint by C&R, do not foreclose an accounting. They find that C&R acted with good faith in all material respect, that RMS and its name partners acted in bad faith in some, and that, at one point, RMS partners repudiated an agreement to resolve the compensation dispute. But none of the acts of bad faith (failure to account or to keep records that allocate percentage fee income, and the conduct by name partners with respect to the SRM transactions) bars the right of the 15 RMS partners who remained after withdrawal of C&R to their share of C&R's fee from the *Rectifier* litigation. Nor do they estop RMS from seeking and obtaining an accounting.

The same is true of the repudiation of the agreement to settle the compensation dispute. There is no finding that this was done in bad faith, or that it was anything more than a breach of contract.

We do not decide what degree of bad faith by RMS would preclude recovery. We do decide that RMS is entitled to a trial on its suit for an accounting. The findings in the 1983 adjudication that C&R are not guilty of unclean hands such as would bar their recovery against RMS are not sufficient to preclude a trial. We therefore must reverse the 1986 judgment insofar as it dismisses RMS's suit for an accounting without trial.

It remains to consider C&R's argument that Rectifier's discharge of RMS put an end to the unfinished business aspect of the *Rectifier* representation, so that C&R's subsequent efforts constituted new business. In order to reach that conclusion, we would have to repudiate our own opinion in *RMS I*, and reject *Jewel* v. *Boxer, supra,* 156 Cal.App.3d 171, and *Fox* v. *Abrams, supra,* 163 Cal.App.3d 610, which followed it. That we decline to do.

### Disposition

These cases are remanded for trial of the RMS suit for an accounting, and the 1983, 1985 and 1986 judgments are otherwise affirmed, with the following directions: (1) implementation of these judgments is stayed until trial of the RMS suit for an accounting; (2) at the conclusion of the trial on that suit, a single judgment shall be prepared by the trial court which shall reflect the net debits and credits resulting from the three judgments and the result of the RMS suit for an accounting; and (3), the trial court is directed to give priority in trial setting to the RMS suit for an accounting so that a

final resolution of this lengthy litigation may be effected. Each side to bear its own costs on appeal.

Feinerman, P. J., and Hastings, J., concurred.

Petitions for a rehearing were denied June 4, 1987.